# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and

correct copy of documents in his custody.

| SIGNATURE | | |
|---|---|---|
| NAME  Richard H. Hunt | DATE  11/20/08 | |
| TITLE Director | | |
| Center for Legislative Archives | | |
| NAME AND ADDRESS OF DEPOSITORY | | |
| The National Archives  Washington, D.C. 20408 | | |

NA FORM APR 85 1407·A

Union Calendar No. 138

80th CONGRESS
1st Session

# H. R. 3190

[Report No. 304]

## IN THE HOUSE OF REPRESENTATIVES

APRIL 24, 1947

Mr. ROBSION introduced the following bill; which was referred to the Committee on the Judiciary

APRIL 24, 1947

Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

# A BILL

To revise, codify, and enact into positive law, Title 18 of the United States Code, entitled "Crimes and Criminal Procedure".

1   *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   That Title 18 of the United States Code, entitled "Crimes

4   and Criminal Procedure", is hereby revised, codified, and

5   enacted into positive law, and may be cited as "Title 18,

6   U. S. C., §—", as follows:

2

# TITLE 18—CRIMES AND CRIMINAL PROCEDURE

| Part | | Sec. |
|---|---|---|
| I. | Crimes | 1 |
| II. | Criminal procedure | 3001 |
| III. | Prisons and prisoners | 4001 |
| IV. | Correction of youthful offenders | 5001 |

## PART I—CRIMES

| Chapter | | Sec. |
|---|---|---|
| 1. | General provisions | 1 |
| 3. | Animals, birds and fish | 41 |
| 5. | Arson | 81 |
| 7. | Assault | 111 |
| 9. | Bankruptcy | 151 |
| 11. | Bribery and graft | 201 |
| 13. | Civil rights | 241 |
| 15. | Claims and services in matters affecting government | 281 |
| 17. | Coins and currency | 331 |
| 19. | Conspiracy | 371 |
| 21. | Contempts constituting crimes | 401 |
| 23. | Contracts | 431 |
| 25. | Counterfeiting and forgery | 471 |
| 27. | Customs | 541 |
| 29. | Elections and political activities | 591 |
| 31. | Embezzlement and theft | 641 |
| 33. | Emblems, insignia, and names | 701 |
| 35. | Escape and rescue | 751 |
| 37. | Espionage and censorship | 791 |
| 39. | Explosives and combustibles | 831 |
| 41. | Extortion and threats | 871 |
| 43. | False personation | 911 |
| 45. | Foreign relations | 951 |
| 47. | Fraud and false statements | 1001 |
| 49. | Fugitives from justice | 1071 |
| 51. | Homicide | 1111 |
| 53. | Indians | 1151 |
| 55. | Kidnaping | 1201 |
| 57. | Labor | 1231 |
| 59. | Liquor traffic | 1261 |
| 61. | Lotteries | 1301 |
| 63. | Mail fraud | 1341 |
| 65. | Malicious mischief | 1361 |
| 67. | Military and Navy | 1381 |
| 69. | Nationality and citizenship | 1421 |
| 71. | Obscenity | 1461 |
| 73. | Obstruction of justice | 1501 |
| 75. | Passports and visas | 1541 |
| 77. | Peonage and slavery | 1581 |
| 79. | Perjury | 1621 |
| 81. | Piracy and privateering | 1651 |
| 83. | Postal service | 1691 |
| 85. | Prison-made goods | 1761 |
| 87. | Prisons | 1791 |
| 89. | Professions and occupations | 1821 |

**3**

| RE | |
| --- | --- |
| | Sec. |
| ____ | 1 |
| ____ | 3001 |
| ____ | 4001 |
| ____ | 5001 |
| | |
| | Sec. |
| ____ | 1 |
| ____ | 41 |
| ____ | 81 |
| ____ | 111 |
| ____ | 151 |
| ____ | 201 |
| ____ | 241 |
| ____ | 281 |
| ____ | 331 |
| ____ | 371 |
| ____ | 401 |
| ____ | 431 |
| ____ | 471 |
| ____ | 541 |
| ____ | 591 |
| ____ | 641 |
| ____ | 701 |
| ____ | 751 |
| ____ | 791 |
| ____ | 831 |
| ____ | 871 |
| ____ | 911 |
| ____ | 951 |
| ____ | 1001 |
| ____ | 1071 |
| ____ | 1111 |
| ____ | 1151 |
| ____ | 1201 |
| ____ | 1231 |
| ____ | 1261 |
| ____ | 1301 |
| ____ | 1341 |
| ____ | 1361 |
| ____ | 1381 |
| ____ | 1421 |
| ____ | 1461 |
| ____ | 1501 |
| ____ | 1541 |
| ____ | 1581 |
| ____ | 1621 |
| ____ | 1651 |
| ____ | 1691 |
| ____ | 1761 |
| ____ | 1791 |
| ____ | 1821 |

| Chapter | Sec. |
| --- | --- |
| 91. Public lands | 1851 |
| 93. Public officers and employees | 1901 |
| 95. Racketeering | 1951 |
| 97. Railroads | 1991 |
| 99. Rape | 2031 |
| 101. Records and reports | 2071 |
| 103. Robbery and burglary | 2111 |
| 105. Sabotage | 2151 |
| 107. Seamen and stowaways | 2191 |
| 109. Searches and seizures | 2231 |
| 111. Shipping | 2271 |
| 113. Stolen property | 2311 |
| 115. Treason, sedition and subversive activities | 2381 |
| 117. White slave traffic | 2421 |

#### CHAPTER 1—GENERAL PROVISIONS

Sec.
1. Offenses classified.
2. Principals.
3. Accessory after the fact.
4. Misprision of felony.
5. United States defined.
6. Department and agency defined.
7. Special maritime and territorial jurisdiction of the United States defined.
8. Obligation or other security of the United States defined.
9. Vessel of the United States defined.
10. Interstate commerce and foreign commerce defined.
11. Foreign government defined.
12. Postal Service defined.
13. Laws of States adopted for areas within Federal jurisdiction.

§ 1.  OFFENSES CLASSIFIED

Notwithstanding any Act of Congress to the contrary:

(1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony.

(2) Any other offense is a misdemeanor.

(3) Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both, is a petty offense.

§ 2.  PRINCIPALS

(a) Whoever commits an offense against the United

4

1 States, or aids, abets, counsels, commands, induces, or pro-
2 cures its commission, is a principal.

3    (b) Whoever causes an act to be done, which if directly
4 performed by him would be an offense against the United
5 States, is also a principal and punishable as such.

6 § 3.  ACCESSORY AFTER THE FACT

7    Whoever, knowing that an offense against the United
8 States has been committed, receives, relieves, comforts or
9 assists the offender in order to hinder or prevent his appre-
10 hension, trial or punishment, is an accessory after the fact.

11    Except as otherwise expressly provided by any Act
12 of Congress, an accessory after the fact shall be im-
13 prisoned not more than one-half the maximum term of im-
14 prisonment or fined not more than one-half the maximum fine
15 prescribed for the punishment of the principal, or both; or if
16 the principal is punishable by death, the accessory shall be
17 imprisoned not more than ten years.

18 § 4.  MISPRISION OF FELONY

19    Whoever, having knowledge of the actual commission
20 of a felony cognizable by a court of the United States, con-
21 ceals and does not as soon as possible make known the same
22 to some judge or other person in civil or military authority
23 under the United States, shall be fined not more than $500
24 or imprisoned not more than three years, or both.

5

or pro-

directly

United

United

forts or

s appre-

fact.

any Act

be im-

n of im-

num fine

th; or if

shall be

mmission

tes, con-

he same

authority

an $500

§ 5.   UNITED STATES DEFINED

    The term "United States", as used in this title in a terri-
torial sense, includes all places and waters, continental or
insular, subject to the jurisdiction of the United States.

§ 6.   DEPARTMENT AND AGENCY DEFINED

   As used in this title:

    The term "department" means one of the executive
departments enumerated in section 1 of Title 5, unless the
context shows that such term was intended to describe the
executive, legislative, or judicial branches of the government.

    The term "agency" includes any department, independ-
ent establishment, commission, administration, authority,
board or bureau of the United States or any corporation in
which the United States has a proprietary interest, unless the
context shows that such term was intended to be used in a
more limited sense.

§ 7.   SPECIAL MARITIME AND TERRITORIAL JURISDICTION
       OF THE UNITED STATES DEFINED

    The term "special maritime and territorial jurisdiction of
the United States", as used in this title, includes:

    (1) The high seas, any other waters within the ad-
miralty and maritime jurisdiction of the United States and
out of the jurisdiction of any particular State, and any vessel
belonging in whole or in part to the United States or any

6

1 citizen thereof, or to any corporation created by or under

2 the laws of the United States, or of any State, Territory,

3 District, or possession thereof, when such vessel is within

4 the admiralty and maritime jurisdiction of the United States

5 and out of the jurisdiction of any particular State.

6      (2) Any vessel registered, licensed, or enrolled under

7 the laws of the United States, and being on a voyage upon

8 the waters of any of the Great Lakes, or any of the waters

9 connecting them, or upon the Saint Lawrence river where

10 the same constitutes the International Boundary Line.

11      (3) Any lands reserved or acquired for the use of the

12 United States, and under the exclusive or concurrent juris-

13 diction thereof, or any place purchased or otherwise acquired

14 by the United States by consent of the legislature of the State

15 in which the same shall be, for the erection of a fort, maga-

16 zine, arsenal, dockyard, or other needful building.

17      (4) Any island, rock, or key containing deposits of

18 guano, which may, at the discretion of the President, be con-

19 sidered as appertaining to the United States.

20 § 8.  OBLIGATION OR OTHER SECURITY OF THE UNITED

21          STATES DEFINED

22      The term "obligation or other security of the United

23 States" includes all bonds, certificates of indebtedness, na-

24 tional bank currency, Federal reserve notes, Federal reserve

25 bank notes, coupons, United States notes, Treasury notes,

1  gold certificates, silver certificates, fractional notes, certificates

2  of deposit, bills, checks, or drafts for money, drawn by or

3  upon authorized officers of the United States, stamps and

4  other representatives of value, of whatever denomination,

5  issued under any Act of Congress, and canceled United

6  States stamps.

7  § 9.  VESSEL OF THE UNITED STATES DEFINED

8      The term "vessel of the United States", as used in this

9  title, means a vessel belonging in whole or in part to the

10  United States, or any citizen thereof, or any corporation

11  created by or under the laws of the United States, or of any

12  State, Territory, District, or possession thereof.

13  § 10.  INTERSTATE COMMERCE AND FOREIGN COMMERCE

14          DEFINED

15      The term "interstate commerce", as used in this title,

16  includes commerce between one State, Territory, Possession,

17  or the District of Columbia and another State, Territory,

18  Possession, or the District of Columbia.

19      The term "foreign commerce", as used in this title, in-

20  cludes commerce with a foreign country.

21  § 11.  FOREIGN GOVERNMENT DEFINED

22      The term "foreign government", as used in this title,

23  includes any government, faction, or body of insurgents within

24  a country with which the United States is at peace, irrespec-

25  tive of recognition by the United States.

8

1 § 12. Postal Service defined

2    The term "Postal Service", as used in this title, includes

3 the "Post Office Department" and every employee thereof,

4 whether or not he has taken the oath of office.

5 § 13. Laws of States adopted for areas within

6       Federal Jurisdiction

7    Whoever within or upon any of the places now exist-

8 ing or hereafter reserved or acquired as provided in section

9 7 of this title, is guilty of any act or omission which,

10 although not made punishable by any enactment of Con-

11 gress, would be punishable if committed or omitted within

12 the jurisdiction of the State, Territory, Possession, or Dis-

13 trict in which such place is situated, by the laws thereof

14 in force at the time of such act or omission, shall be guilty

15 of a like offense and subject to a like punishment.

CHAPTER 2.—ANIMALS, BIRDS AND FISH

Sec.
41. Hunting, fishing, trapping; disturbance or injury on wildlife refuges.
42. Importation of injurious animals and birds; permits; specimens for museums.
43. Transportation or importation in violation of state, national, or foreign laws.
44. Marking packages or containers.
45. Capturing or killing carrier pigeons.

16 § 41. Hunting, fishing, trapping; disturbance or

17       injury on wildlife refuges

18    Whoever, except in compliance with rules and regula-

19 tions promulgated by authority of law, hunts, traps, captures,

91

Sec.
594. Polling armed forces.
597. Expenditures to influence voting.
598. Coercion by means of relief appropriations.
599. Promise of appointment by candidate.
600. Promise of employment or other benefit for political activity.
601. Deprivation of employment or other benefit for political activity.
602. Solicitation of political contributions.
603. Place of solicitation.
604. Solicitation from persons on relief.
605. Disclosure of names of persons on relief.
606. Intimidation to secure political contributions.
607. Making political contributions.
608. Limitations on political contributions and purchases.
609. Maximum contributions and expenditures.
610. Contributions by national banks or corporations.
611. Contributions by firms or individuals contracting with the United States.
612. Publication or distribution of political statements.

1 § 591. DEFINITIONS

2    When used in sections 597, 599, 602, 609 and 610 of

3 this title—

4    The term "election" includes a general or special elec-

5 tion, and, in the case of a Resident Commissioner from the

6 Philippine Islands, an election by the Philippine Legislature,

7 but does not include a primary election or convention of a

8 political party;

9    The term "candidate" means an individual whose name

10 is presented for election as Senator or Representative in, or

11 Delegate or Resident Commissioner to, the Congress of the

12 United States, whether or not such individual is elected;

13    The term "political committee" includes any committee,

14 association, or organization which accepts contributions or

15 makes expenditures for the purpose of influencing or attempt-

16 ing to influence the election of candidates or presidential and

104

1   than one year, or both; and, if the violation was willful, by

2   a fine of not more than $10,000 or imprisonment of not more

3   than two years, or both.

4   § 610.  CONTRIBUTIONS BY NATIONAL BANKS OR CORPO-

5          RATIONS

6        It is unlawful for any national bank, or any corpora-

7   tion organized by authority of Congress, to make a contri-

8   bution in connection with any election to any political office,

9   or for any corporation whatever to make a contribution in

10  connection with any election at which Presidential and Vice-

11  Presidential electors or a Senator or Representative in, or

12  a Delegate or Resident Commissioner to Congress are to be

13  voted for, or for any candidate, political committee, or other

14  person to accept or receive any contribution prohibited by

15  this section.

16       Every corporation which makes any contribution in vio-

17  lation of this section, shall be fined not more than $5,000;

18  and every officer or director of any corporation who con-

19  sents to any contribution by the corporation in violation of

20  this section, shall be fined not more than $1,000 or impris-

21  oned for not more than one year, or both.

22  § 611.  CONTRIBUTIONS BY FIRMS OR INDIVIDUALS CON-

23          TRACTING WITH THE UNITED STATES

24       Whoever, entering into any contract with the United

25  States or any department or agency thereof, either for the

117

1  receiver of a national bank, or any agent or employee of the

2  receiver, or a Federal reserve agent, or an agent or employee

3  of a Federal reserve agent or of the Board of Governors of

4  the Federal Reserve System, embezzles, abstracts, purloins

5  or willfully misapplies any of the moneys, funds or credits of

6  such bank or any moneys, funds, assets or securities intrusted

7  to the custody or care of such bank, or to the custody or care

8  of any such agent, officer, director, employee or receiver, with

9  intent to injure or defraud such bank or any other company,

10  body politic or corporate, or any individual person, or to

11  deceive any officer of such bank, or the Comptroller of the

12  Currency, or the Federal Deposit Insurance Corporation, or

13  any agent or examiner appointed to examine the affairs of

14  such bank, or the Board of Governors of the Federal Reserve

15  System, shall be fined not more than $5,000 or imprisoned

16  not more than five years, or both; but if the amount em-

17  bezzled, abstracted, purloined or misapplied does not exceed

18  $100, he shall be fined not more than $1,000 or imprisoned

19  not more than one year, or both.

20      As used in this section, the term "national bank" is

21  synonymous with "national banking association"; "member

22  bank" means and includes any national bank, state bank, or

23  bank and trust company which has become a member of one

24  of the Federal Reserve Banks; and "insured bank" includes

25  any bank, banking association, trust company, savings bank,

118

1   or other banking institution, the deposits of which are insured

2   by the Federal Deposit Insurance Corporation.

3   § 657.  LENDING, CREDIT AND INSURANCE INSTITUTIONS

4       Whoever, being an officer, agent or employee of or con-

5   nected in any capacity with the Reconstruction Finance Cor-

6   poration, Federal Deposit Insurance Corporation, Home

7   Owners' Loan Corporation, Farm Credit Administration,

8   Federal Housing Administration, Federal Farm Mortgage

9   Corporation, Federal Crop Insurance Corporation, Farmers'

10  Home Corporation or any land bank, intermediate credit

11  bank, bank for cooperatives or any lending, mortgage, insur-

12  ance, credit or savings and loan corporation or association

13  authorized or acting under the laws of the United States, and

14  whoever, being a receiver of any such institution, or agent

15  or employee of the receiver, embezzles, abstracts, purloins or

16  willfully misapplies any moneys, funds, credits, securities or

17  other things of value belonging to such institution, or pledged

18  or otherwise intrusted to its care, with intent to defraud such

19  institution or any other company, body politic or corporate,

20  or any individual, or to deceive any officer of such institution

21  or any department or agency of the United States, or any

22  auditor, examiner, agent or other person authorized to ex-

23  amine into the affairs of such institution, shall be fined not

24  more than $5,000 or imprisoned not more than five years,

25  or both; but if the amount or value embezzled, abstracted.

134

1  found guilty in any court of the United States of any capital

2  crime, while going to execution or during execution, shall

3  be fined not more than $25,000 or imprisoned not more than

4  twenty-five years, or both.

5  § 754.  RESCUE OF BODY OF EXECUTED OFFENDER

6      Whoever, by force, rescues or attempts to rescue, from

7  the custody of any marshal or his officers, the dead body of

8  an executed offender, while it is being conveyed to a place of

9  dissection, as provided by section 3567 of this title, or by

10  force rescues or attempts to rescue such body from the place

11  where it has been deposited for dissection in pursuance of

12  said section 3567, shall be fined not more than $100 or

13  imprisoned not more than one year, or both.

14  § 755.  OFFICER PERMITTING ESCAPE

15      Whoever, having in his custody any prisoner by virtue

16  of process issued under the laws of the United States by any

17  court, judge, or commissioner, voluntarily suffers such

18  prisoner to escape, shall be fined not more than $2,000 or

19  imprisoned not more than two years, or both.

20  § 756.  INTERNEE OF BELLIGERENT NATION

21      Whoever, within the jurisdiction of the United States,

22  aids or entices any person belonging to the armed forces of a

23  belligerent nation or faction who is interned in the United

24  States in accordance with the law of nations, to escape or

25  attempt to escape from the jurisdiction of the United States

158

1934, or makes any loan to such foreign government, political subdivision, organization or association, except a renewal or adjustment of existing indebtedness, while such government, political subdivision, organization or association, is in default in the payment of its obligations, or any part thereof, to the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

This section is applicable to individuals, partnerships, corporations, or associations other than public corporations created by or pursuant to special authorizations of Congress, or corporations in which the United States has or exercises a controlling interest through stock ownership or otherwise.

§ 956. CONSPIRACY TO INJURE PROPERTY OF FOREIGN GOVERNMENT

(a) If two or more persons within the jurisdiction of the United States conspire to injure or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, or any railroad, canal, bridge, or other public utility so situated, and if one or more such persons commits an act within the jurisdiction of the United States to effect the object of the conspiracy, each of the parties to the conspiracy shall be fined not more than $5,000 or imprisoned not more than three years, or both.

·(b) ⌐
shall descr
of the cons
§ 957. ]

Who⌐
and willf⌐
used or d
statute, o
States un
not mor⌐
years, or
§ 958. ⌐

Any
diction t
a foreig⌐
against
whom t⌐
than $2
both.
§ 959.

(a)
himself,
or to g
intent ⌐

367

1 international extradition, including the fees of the com-

2 missioner, shall be certified by the judge or commissioner

3 before whom the hearing shall take place to the Secretary

4 of State of the United States, and the same shall be paid

5 out of appropriations to defray the expenses of the judiciary

6 or the Department of Justice as the case may be.

7     The Attorney General shall certify to the Secretary

8 of State the amounts to be paid to the United States on

9 account of said fees and costs in extradition cases by the

10 foreign government requesting the extradition, and the

11 Secretary of State shall cause said amounts to be collected

12 and transmitted to the Attorney General for deposit in the

13 Treasury of the United States.

**CHAPTER 211.—JURISDICTION AND VENUE**

Sec.
3231. District courts.
3232. District of offense—Rule.
3233. Transfer within District—Rule.
3234. Change of venue to another district—Rule.
3235. Venue in capital cases.
3236. Murder or manslaughter.
3237. Offenses begun in one district and completed in another.
3238. Offenses not committed in any district.
3239. Threatening communications.
3240. Creation of new district or division.
3241. Jurisdiction of offenses under certain sections.
3242. Indians committing certain offenses; acts on reservations.
3243. Jurisdiction of State of Kansas over offenses committed by or against Indians on Indian reservations.

14 **§ 3231. DISTRICT COURTS**

15     Offenses against the United States shall be cognizable

16 in the district courts of the United States, but nothing in

17 this title shall be held to take away or impair the jurisdiction

18 of the courts of the several states under the laws thereof.

415

1   § 3771.  PROCEDURE TO AND INCLUDING VERDICT

2        The Supreme Court of the United States shall have the

3   power to prescribe, from time to time, rules of pleading,

4   practice, and procedure with respect to any or all pro-

5   ceedings prior to and including verdict, or finding of guilty

6   or not guilty by the court if a jury has been waived, or

7   plea of guilty, in criminal cases and proceedings to punish

8   for criminal contempt of court in district courts of the

9   United States, including the district courts of Alaska,

10  Hawaii, Puerto Rico, Canal Zone, and the Virgin Islands,

11  in the Supreme Courts of Hawaii and Puerto Rico, and in

12  proceedings before United States commissioners.  Such rules

13  shall not take effect until they shall have been reported to

14  Congress by the Attorney General at the beginning of a

15  regular session thereof and until after the close of such

16  session, and thereafter all laws in conflict therewith shall be

17  of no further force and effect.

18  § 3772.  PROCEDURE AFTER VERDICT

19        The Supreme Court of the United States shall have the

20  power to prescribe, from time to time, rules of practice and

21  procedure with respect to any or all proceedings after

22  verdict, or finding of guilt by the court if a jury has been

23  waived, or plea of guilty, in criminal cases and proceedings

416

1  to punish for criminal contempt in district courts of the

2  United States, including the District Courts of Alaska,

3  Hawaii, Puerto Rico, Canal Zone, District of Columbia, and

4  Virgin Islands, in the Supreme Courts of Hawaii, and

5  Puerto Rico, in the United States Circuit Courts of Appeals,

6  in the United States Court of Appeals for the District of

7  Columbia, and in the Supreme Court of the United States.

8  This section shall not give the Supreme Court power to

9  abridge the right of the accused to apply for withdrawal of

10  a plea of guilty, if such application be made within ten days

11  after entry of such plea, and before sentence is imposed.

12     The right of appeal shall continue in those cases in

13  which appeals are authorized by law, but the rules made

14  as herein authorized may prescribe the times for and manner

15  of taking appeals and applying for writs of certiorari and

16  preparing records and bills of exceptions and the conditions

17  on which supersedeas or bail may be allowed.

18     The Supreme Court may fix the dates when such rules

19  shall take effect and the extent to which they shall apply

20  to proceedings then pending, and after they become effective

21  all laws in conflict therewith shall be of no further force.

### PART III—PRISONS AND PRISONERS

| Chapter | Sec. |
| --- | --- |
| 301. General provisions | 4001 |
| 303. Bureau of Prisons | 4041 |
| 305. Commitment and transfer | 4081 |
| 307. Employment | 4121 |
| 309. Good time allowances | 4161 |
| 311. Parole | 4201 |

456

1 iron and of which the compartments are divided off by

2 watertight bulkheads extending to the upper deck."

3    SEC. 18. The Canal Zone Code is amended by adding

4 a section at the end of chapter 2 of Title 7 thereof to read as

5 follows:

6    "SEC. 44a. The following sections of Title 18, United

7 States Code, shall apply to and within the Canal Zone:

8 Sections 6, 8, 11, 331, 371, 472, 474, 478, 479, 480,

9 481, 482, 483, 485, 488, 489, 490, 499, 502, 506, 594,

10 595, 598, 600, 601, 604, 605, 608, 611, 612, 703, 756,

11 791, 792, 793, 794, 795, 796, 797, 915, 917, 951, 953,

12 954, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965,

13 966, 967, 1017, 1073, 1301, 1364, 1382, 1542, 1543,

14 1544, 1546, 1548, 1621, 1622, 1761, 1821, 1914, 2151,

15 2152, 2153, 2154, 2155, 2156, 2199, 2231, 2234, 2235,

16 2274, 2275, 2277, 2304, 2385, 2388, 2389, 2390, 2421,

17 2422, 2423, 2424, 3059, 3105, 3109.

18    "b. The following sections of Title 18, United States

19 Code, shall not apply to or within the Canal Zone: Sec-

20 tions 41, 42, 43, 44, 544, 545, 546, 547, 551, 552, 708,

21 968, 1856, 3481."

22    SEC. 19. If any part of Title 18, Crimes and Criminal

457

off by

adding

read as

United

Zone:

480,

594,

756,

953,

965,

.543,

'151,

235,

421,

ates

Sec-

'08,

inal

1 Procedure, as set out in section 1 of this Act, shall be held
2 invalid the remainder shall not be affected thereby.

3    SEC. 20. No inference of a legislative construction is
4 to be drawn by reason of the chapter in Title 18, Crimes
5 and Criminal Procedure, as set out in section 1 of this Act,
6 in which any particular section is placed, nor by reason of
7 the catchlines used in such title.

8    SEC. 21. This Act shall become effective immediately,
9 except that section 610 of Title 18, Crimes and Criminal
10 Procedure, as set out in section 1 of this Act, and the repeal
11 of section 313 of the Act of February 28, 1925, chapter
12 368, 43 Stat. 1074, provided for in the schedule of repeals
13 set out in this Act, shall both become effective upon the
14 termination of section 9 of the Act of June 25, 1943, chap-
15 ter 144, 57 Stat. 167."

16    SEC. 22. The sections or parts thereof of the Revised
17 Statutes or Statutes at Large enumerated in the following
18 schedule are hereby repealed. Any rights or liabilities now
19 existing under such sections or parts thereof shall not be
20 affected by this repeal.

467

| Date | Statutes at Large | | | | U. S. Code | |
|------|---------|---------|--------|------|-------|---------|
| | Chapter | Section | Volume | Page | Title | Section |
| 1935—May 24__ | 142 | ---------- | 49 | 289 | 18 | 641 |
| May 28__ | 150 | 20, 21 | 49 | 298 | 12 | 1467 |
| June 3____ | 164 | 21 | 49 | 319 | 12 | 981 |
| June 15__ | 259 | 2 | 49 | 378 | 28 | 504a |
| Do____ | 261 | 201, 202 | 49 | 380, 381 | 18 | 392, 393, 393a, 394 |
| June 20__ | 284 | ---------- | 49 | 394 | 18 | 468 |
| June 28__ | 326 | ---------- | 49 | 427 | 18 | 338a |
| July 24__ | 412 | 1–4 | 49 | 494, 495 | 18 | 396b–396e |
| Aug. 3__ | 432 | ---------- | 49 | 513, 514 | 18 | 753b |
| Aug. 5__ | 438 | 2 | 49 | 518 | 19 | 1702 |
| Do____ | 438 | 304 (a), 309 | 49 | 527, 528 | 19 | 1591, 1601a |
| Aug. 23__ | 614 | ᵐ 101 | 49 | 684 (700–703) | 12 | 264 (s)– 264 (u), 264 (w), 264 (x) |
| Aug. 23__ | ᵐ 614 | 101 | 49 | 684 (701) | 12 | 264 (B) (v) (1) |
| Do____ | 614 | 316, 318, 326 (a) (b), 332, 333 | 49 | 712, 715, 716, 719, 720 | 12 | 583, 585, 587, 588a, 592–594 |
| Aug. 26__ | 692 | ---------- | 49 | 866 | 18 | 349a |
| Do____ | 693 | ---------- | 49 | 867 | 18 | 317 |
| Do____ | 694 | ---------- | 49 | 867 | 18 | 320 |
| Aug. 27__ | 740 | 201, 204 | 49 | 877, 878 | 18 | 53a, 77a, 646 |
| Do____ | 748 | 5 | 49 | 892, 893 | 25 | 305d |
| Do____ | 748 | ᵐ 6 | 49 | 893 | 25 | 305e |
| 1936—Jan. 24__ | 29 | ---------- | 49 | 1099 | 18 | 408c–1 |
| Feb. 8__ | 40 | ---------- | 49 | 1105 | 18 | 253 |
| June 20__ | 634 | 4 | 49 | 1556 | 16 | 705 |
| Do____ | 635 | 1, 2 | 49 | 1557 | 22 | 248 |
| Do____ | 640 | 2–5, 7, 8 | 49 | 1562, 1563, 1564 | 28 | 695a–695d 695f, 695g |
| June 24__ | 746 | ---------- | 49 | 1899, 1900 | 18 | 407a |
| June 25__ | 815 | 1–8, 10–12 | 49 | 1928–1930 | 18 27 | 388–390 221–228 |
| Do____ | 816 | 6 | 49 | 1936 | 46 | 710a |
| June 26__ | 830 | 3 | 49 | 1940 | 18 | 253 |
| 1937—June 19__ | 367 | ---------- | 50 | 304 | 18 | 542 |
| July 22__ | 517 | 52 | 50 | 531, 532 | 7 | 1026 |
| Aug. 24__ | 746 | ---------- | 50 | 748, 749 | 28 | 421 |
| Do____ | 747 | ---------- | 50 | 749 | 12 | 588b |

ᵐ The part amending sec. 12 B (s–u), (w, x) of Act Dec. 23, 1913, ch. 6, as added by Act June 16, 1933, ch. 89, § 8 (part), 48 Stat. 168 (177, 178).
ᵐ The part amending sec. 12 B (v) of Act of Dec. 23, 1913, ch. 6 as added by Act June 16, 1933, ch. 89, § 8 (part), 48 Stat. 168 (178), being specifically the provisions which, in said Act of Aug. 23, 1935, ch. 614, § 101, 49 Stat. 684 (701), were re-designated as sec.12 B (v) (1).
ᵐ First paragraph, only.

:3b
141
111
388
556
135
167
468
725
38d
38d
44a
688
:62c
:04a
7(e)
56a,
:56b
121a
587
254
408d
408c
408e
252
588d
:18e,
419
575
276b
120b,
120d,
10e–1
2–86
300a
340
316
ᵐ326
, 597,
3, 599
309
-744n
254
( (a)–
31 (c)

470

| Date | Statutes at Large | | | | U. S. Code | |
|---|---|---|---|---|---|---|
| | Chapter | Section | Volume | Page | Title | Section |
| 1941—Dec. 22 | 618 | ---------- | 55 | 853 | 18 | 521 |
| Dec. 31 | 642 | 1–3 | 55 | 876, 877 | 18 | 503, 503, note, 504 |
| 1942—Mar. 7 | 160 | ---------- | 56 | 141 | 18 | 361 |
| Mar. 10 | 178 | 1 (part) | 56 | [45]158 | 18 | 647 |
| Mar. 21 | 191 | ---------- | 56 | 173 | 18 | 97a |
| Mar. 27 | 199 | 1106 | 56 | 184 | 50 App. | 641e |
| May 9 | 295 | 1 | 56 | 271, 272 | 18 | 682 |
| Aug. 24 | 555 | 1, 2 | 56 | 747, 748 | 18 | 590a |
| Sept. 16 | 561 | [49]314 | | | 50 | 344 |
| Dec. 24 | 823 | 1, 2, 3 | 56 | 1087 | 18 | 420f, 420g, 420h |
| Do | 824 | ---------- | 56 | 1087, 1088 | 50 | 101 |
| 1943—June 30 | 179 | 1 (part) | 57 | [44]258 | 18 | 647 |
| Nov. 22 | 302 | ---------- | 57 | 591 | 18 | 87 |
| 1944—Mar. 4 | 82 | 1, 2, 3, 4 | 58 | 111 | 18 | 472, 473, 474 |
| Apr. 1 | 151 | ---------- | 58 | 149, 150 | 18 | 282a |
| Apr. 4 | 162 | ---------- | 58 | 188 | 18 | 409 |
| July 1 | 358 | 19(a)(d)(e) | 58 | 667, 668 | 41 | [45]119 |
| Do | 358 | 19 (b) | 58 | 667 | 18 | 590a |
| Sept. 27 | 425 | ---------- | 58 | 752 | 18 | 294 |
| Oct. 3 | 479 | 28 | 58 | 781 | 18 | 590a |
| Dec. 20 | 623 | 4 | 58 | 837 | 12 | 1150c |
| Dec. 23 | 706 | 1, 2, 3 | 58 | 914, 915 | 18 | 62, 62a, 62b |
| 1945—Apr. 30 | 103 | ---------- | 59 | 101 | 18 | 97b |
| May 15 | 126 | ---------- | 59 | 168 | 18 | 518a |
| June 8 | 178 | 1, 2, 3 | 59 | 234, 235 | 18 | 241, 241a, 242 |
| Sept. 24 | 383 | 1, 2, 3 | 59 | 536 | 18 | 408 |
| 1946—May 15 | 258 | ---------- | 60 | 182 | 18 | 518a |
| July 3 | 537 | ---------- | 60 | 420 | 15 | 17 note |
| | | | | | 18 | 420a– 420e–1 |
| | | | | | 29 | 52 note, 101 note, 151 note |
| July 10 | 547 | ---------- | 60 | 524, 525 | 18 | 641 |
| July 24 | 606 | ---------- | 60 | 656 | 18 | 409–411 |
| Aug. 2 | 735 | ---------- | 60 | 789 | 18 | 408e |
| Aug. 14 | 964 | [45]3 | 60 | 1064 | 7 | 1026 |

[45] First proviso, only, appearing on this page.
[45] As added by Act Apr. 1, 1944, ch. 150 (part), 58 Stat. 146.
[45] Second proviso, only, appearing on this page.
[44] First, second, third, and sixth paragraphs, only, of this section of Title 41 of the United States Code, 1940 edition.
[49] Only the provisions amending section 52 of Act July 22, 1937, ch. 517, title IV, 50 Stat. 531, 532.

Union Calendar No. 138

80th CONGRESS
1st Session

# H. R. 3190

[Report No. 304]

# A BILL

To revise, codify, and enact into positive law,
Title 18 of the United States Code, entitled
"Crimes and Criminal Procedure".

By Mr. ROBSION

APRIL 24, 1947
Referred to the Committee on the Judiciary

APRIL 24, 1947
Committed to the Committee of the Whole House on
the State of the Union and ordered to be printed

PASSED HOUSE
AMENDED

MAY 12 1947



**COPY**

Reproduced at the National Archives

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and correct copy of documents in his custody.

| SIGNATURE | | |
|---|---|---|
| NAME<br>Richard H. Hunt | | DATE<br>11/20/08 |
| TITLE Director<br>Center for Legislative Archives | | |
| NAME AND ADDRESS OF DEPOSITORY | | |
| The National Archives<br>Washington, D.C. 20408 | | |

NA FORM APR 85 '407-A

*H*

Case 2:10-cr-00520-JCM -RJJ Document 40-2 Filed 07/12/12 Page 26 of 88

{ 59th Congress }
{ 2d Session }   HOUSE OF REPRESENTATIVES   { Document }
{ No. 355 }

# HINDS' PRECEDENTS

### OF THE

# HOUSE OF REPRESENTATIVES

### OF THE

## UNITED STATES

### INCLUDING REFERENCES TO PROVISIONS
### OF THE CONSTITUTION, THE LAWS, AND DECISIONS
### OF THE UNITED STATES SENATE

By

**ASHER C. HINDS, LL. D.**

Clerk at the Speaker's Table

## VOLUME IV

PUBLISHED BY AUTHORITY OF THE ACT OF CONGRESS
APPROVED MARCH 4, 1907

WASHINGTON
GOVERNMENT PRINTING OFFICE
1907

# Chapter LXXXIII.

## THE JOURNAL AND ITS APPROVAL.

---

1. Provisions of the Constitution.   Section 2786.
2. The official record.   Section 2787.[1]
3. Title and copy.   Sections 2788–2789.
4. Reading and approval.   Sections 2790–2792.[2]
5. Business not transacted before approval.   Sections 2793–2800.[3]
6. Motions to amend, especially as to record of votes.   Sections 2801–2770.
7. Delay in approval.   Sections 2771–2775.
8. As to record of amendments and approval.   Sections 2776–2783.[4]
9. Changes in as related to actual facts.   Sections 2784–2790.[5]
10. Changes after approval.   Sections 2790–2797.
11. As to entry of protests and declarations.   Sections 2798–2800.[6]
12. In general.   Sections 2801, 2802.

---

**2786.** The Constitution requires the House to keep and publish a Journal, excepting from publication such parts as require secrecy.

Votes by yeas and nays and veto messages of the President are required by the Constitution to be spread on the Journal.

The Constitution of the United States, in section 5 of Article I, provides:

Each House shall keep a Journal of its proceedings, and from time to time publish the same, excepting such parts as may in their judgment require secrecy; and the yeas and nays of the Members of either House on any question shall, at the desire of one-fifth of those present, be entered on the Journal.[a]

Also in section 7 of Article I:

Every bill which shall have passed the House of Representatives and the Senate shall, before it becomes a law, be presented to the President of the United States. If he approve he shall sign it, but if not he shall return it, with his objections, to that House in which it shall have originated, who shall enter the objections at large on their Journal and proceed to reconsider it.

---

[1] Printed and distributed by the Clerk.   Section 251 of Volume I.
Office of journal clerk and its requirements.   Section 2644 of Volume III.
[2] Preparation and reading is not prevented by death of Clerk.   Section 237 of Volume I.
Amendment of Congressional Record secondary to.   Section 6935 of Volume V.
[3] Administration of oath to Member-elect before.   Sections 171, 172 of Volume I.
[4] See also section 3061 of this volume.
[5] Clerk declines to entertain a protest at organization.   Section 80 of Volume I.
Summary of precedents as to entry of protests.   Sections 2697, 2723 of this volume.
[6] Field v. Clark, 143 U. S., 649.

1

2727. **The Journal and not the Congressional Record is the official record of the proceedings of the House.**—On the legislative day of February 13, 1885,[1] but in reality on the calendar day of February 14, Mr. Henry G. Turner, of Georgia, as a question of order stated that upon the motion of Mr. Albert S. Willis, of Kentucky, to lay on the table the appeal of Mr. Thomas B. Reed, of Maine, from the decision of the Chair that the motion of Mr. Willis, made on the 12th instant, to limit debate on the pending section and all amendments thereto in the Committee of the Whole House on the state of the Union on the bill of the House, H. R. 8120 (river and harbor bill), it appeared by the record that the yeas were 97 and the nays 103, and that consequently the said appeal was not laid on the table, and moved the correction of the Journal accordingly.

The Speaker pro tempore[2] held the said question to be not one of order at this time and also that the official record of the proceedings of the House was its Journal, and that the publication in the Record was no evidence of the incorrectness of the Journal.

On motion of Mr. Turner, the Record was corrected to correspond with the roll call as it appeared in the Journal.

2728. **The House in early days fixed the title of the Journal.**—On January 8, 1790,[3] the Journal having been read by the Clerk, Mr. Elias Boudinot, of New Jersey, moved to correct the title by striking out all the words after declaring it merely the Journal of the House of Representatives.

After debate, the following form of title was agreed to:

Journal of the House of Representatives of the United States.

At a session of the Congress of the United States, begun and held at the city of New York, on Monday, the 4th day of January, 1790, being the second session of the First Congress, held under the present Constitution of Government of the United States, being the day appointed by law for the meeting of the present session.

At the next session the form was somewhat modified.[4]

At the beginning of the Second Congress the form of title became—

Journal of the House of Representatives of the United States.

CONGRESS OF THE UNITED STATES.

Begun and held at the city of Philadelphia, in the State of Pennsylvania, on Monday, the 24th of October, 1791, being the first session of the Second Congress held under the Constitution of Government of the United States.[5]

On December 7, 1829, the title to the Journal appears for the first time with this added clause—

and in the fifty-fourth year of the independence of the said States.

Neither the Journal nor debates explain this addition.[6]

[1] Second session Forty-eighth Congress, Journal, p. 554.
[2] John H. Bagley, jr., of New York, Speaker pro tempore.
[3] Second session First Congress, Annals, p. 1077; Journal, p. 123 (Gales & Seaton ed.).
[4] Journal, p. 329 (Gales & Seaton ed.).
[5] First session Second Congress, Journal, p. 433 (Gales & Seaton ed.).
[6] First session Twenty-first Congress, Journal, p. 3; Debates, p. 478.

Case 2:10-cr-00520-JCM -RJJ   Document 40-2   Filed 07/12/12   Page 29 of 88

The clause disappears at the beginning of the Journal of the second session of the Twenty-first Congress, but appears at the beginning of the Journal for the first session of the Twenty-second Congress. The clause again disappears in the Journal of the first session of the Twenty-third Congress.

In the Journal for the first session of the Twenty-fourth Congress, in the introductory paragraph, the phrase "and in the sixtieth year of the Independence of said States" appears. This phrase does not appear in the introductory paragraph of the Journal of the second session of that Congress.

The present title of the Journal is:

Journal of the House of Representatives—Congress of the United States—Begun and held at the Capitol, in the city of Washington, in the District of Columbia, on Monday the fourth day of December, in the year of our Lord nineteen hundred and five, being the first session of the Fifty-ninth Congress, held under the Constitution of the United States, and in the one hundred and thirtieth year of the Independence of said States.[1]

**2730. The title of the Journal indicates whether or not the Congress was convened by law.**—The title of the Journal, in cases where the Congress is convened by law, indicates that fact. Thus on March 4, 1867,[2] the Journal speaks of the session as "held in pursuance of the act of January 22, 1867," and on March 4, 1869,[3] as "held in pursuance of the Constitution and laws of the United States," the Congress being convened in accordance with the law of January 22, 1867.

**2730. The written Journal of the House has been preserved, either in the original draft, or in a copy.**

A discussion of the nature and functions of the Journal.

During the debate on Thomas H. Benton's expunging resolutions in the Senate in 1836, application was made to the Clerk of the House for a statement as to the usages of the House in regard to its Journals. Clerk Walter S. Franklin transmitted statements to Mr. Isaac Hill, a Senator, who presented them to the Senate in debate on May 27, 1836.[4]

Clerk Franklin, in his communication, says that "the original rough manuscript Journal" of the House of Representatives of the United States (those read on the mornings) have not been preserved to a period anterior to the commencement of the first session of the Eighteenth Congress (1823–24). The Clerk also adds the following letter, addressed to himself by Mr. S. Burch, evidently an employee of the Clerk's office, and under date of April 6, 1836:

I entered this office a youth, under John Beckley, who was the first Clerk of the House of Representatives under the present Constitution of the United States, and who died in the year, 1807.

During the recess of Congress he put me at what was termed "recording the Journal" of the preceding session, which was to write it off from the printed copy into a large bound volume. I inquired of him why it was that it was copied when there were so many printed copies? He answered that the printed copies would probably in time disappear from use, etc.; the large manuscript volume would not.

The "rough Journal," as it was then termed and is still termed, being the original rough draught used in the House on the morning after the day of which it narrates the proceedings was not and had

---

[1] First session Fifty-ninth Congress, Journal, p. 3.
[2] First session Fortieth Congress, Journal, p. 3.
[3] First session Forty-first Congress, Journal, p. 3.
[4] First session Twenty-fourth Congress, Debates, p. 1694.
[5] In 1889 we find the House amending the manuscript Journal of a previous date, as well as the printed copy. So the manuscript Journal was conceived of as an existing record. (Second session Fiftieth Congress, Record, p. 161.)

not from the beginning been preserved. I inquired the reason, and was answered that the printed copy was the official copy, as it was printed under the official order of the House; and as errors, which were sometimes discovered in the rough Journal, were corrected in the proofs of the printed copy the printed copy was the most correct, and that therefore there was no use in lumbering the office with the "rough Journal" after it had been printed.

Two of Mr. Beckley's immediate successors in office, Mr. Magruder and Mr. Dougherty, viewed the matter as Mr. Beckley viewed it. I knew the fact from having called their attention to the subject. I often reflected upon the subject; and it appeared to me to be proper that the "rough Journal" should be preserved, although I could not see any purpose whatever to be answered by doing so. I often conversed with the clerks of the office upon the subject; but, as we were only subordinates, the practice was not changed until the first session of the Eighteenth Congress (1823–24), when I determined, without consulting my superior, that the "rough Journal" should no longer be thrown away, but be preserved and bound in volumes, and it has been regularly preserved and bound since.[1]

**2731. It is the uniform practice of the House to approve its Journal for each legislative day.**—On March 24, 1880,[2] in the course of proceedings relating to the approval of the Journal, the Speaker[3] said:

The Chair desires to say that by the Constitution of the United States this House is required to keep a journal of its proceedings. In accordance with the rule adopted in 1789 (the practice under which has been unbroken) the House each morning approves the Journal of the proceedings of the prior day's session. The Chair puts the question in this form: "If there be no objection, the Journal of the prior day's proceedings will stand approved." That has been the practice under the old rule; and the new rule is in language on this point the same as the rule adopted in 1789. The first clause of Rule XXIV[4] * * * states distinctly that the Journal shall be approved. The Chair thinks it is in accord with the uniform practice in all legislative bodies that the Journal shall be approved.

**2732. The Journal may neither be read nor approved until a quorum has appeared.**—On April 9, 1842,[5] at 11 o'clock, the hour to which the House stood adjourned, the Speaker took the chair and directed the Journal of yesterday to be read. Mr. William Russell, of Ohio, objected to the reading of the Journal on the ground that a quorum had not appeared. The Speaker decided that it was in order to read the Journal in the absence of a quorum. From this decision Mr. Russell took an appeal to the House. On a motion to lay the appeal on the table, there were 96 ayes to 18 noes, a total of 114; not a quorum.

The Speaker[6] here stated that his decision had been made hastily and without referring to the rules; that during the call of the yeas and nays he had looked into

---

[1] For an interesting discussion of the nature and functions of the Journal required under the Constitution, with precedents in English parliamentary history, as well as in colonial and later times in America, see the debates over Mr. Benton's expunging resolution in the Senate at this time, Debates, First session Twenty-fourth Congress, pp. 377–683, 1583–1598, 1594–1597. Mr. Benton's resolution to expunge from the Senate Journal the resolution censuring President Jackson was agreed to January 16, 1837. (Second session Twenty-fourth Congress, Debates, p. 504.)

In the earlier history of the House the Journal was published at frequent intervals and placed on the seats of Members. (See Globe of December 12, 1845, second session Thirtieth Congress, p. 32.)

On February 7, 1872, the House discontinued the old custom of furnishing the Journal to Members in sheets. (Second session Forty-second Congress, Globe, p. 301; Journal, p. 306.)

The Journal at present is published at the end of each session.

[2] Second session Forty-sixth Congress, Record, p. 1837.

[3] Samuel J. Randall, of Pennsylvania, Speaker.

[4] See section 2655 of this volume. The rule rather assumes than directs that the Journal is to be approved.

[5] Second session Twenty-seventh Congress, Journal, p. 679; Globe, p. 426.

[6] John White, of Kentucky, Speaker.

34                     PRECEDENTS OF THE HOUSE OF REPRESENTATIVES.                     § 2008

being in secret session, had passed the "act declaring war between Great Britain and her dependencies," whereupon Mr. George Poindexter moved to have inserted in the Journal a declaration in the following words:

> George Poindexter, Delegate from the Mississippi Territory, not having a constitutional right to record his suffrage on the Journal of the House on the important question under consideration, and being prevented without... of the propriety of the measure, asks the indulgence of the House to express his own and the cause of his constituents,[1] in support of the honorable and dignified attitude which the Government of his country has assumed in vindication of its rights against the lawless violence and unprecedented usurpation of the Government of Great Britain.

This paper was read, and appeared in the Journal of the next day, whereupon Mr. Nathaniel Macon, of North Carolina, moved that it be expunged from the Journal. This motion was disagreed to—yeas 44, nays 62. A motion that the House proceed to consider the declaration was decided in the negative.

2008. The parliamentary method of raising a committee to investigate an alleged error in the Journal has not been utilized.—On February 10, 1885,[2] a question being raised as to the correctness of the Journal, a motion was made that a committee be appointed to ascertain the facts in regard to the matter over which the error was alleged to occur. This motion was made in accordance with the parliamentary principle laid down in Jefferson's Manual. The motion was not agreed to.

2010. Certified extracts of the Journal are admitted as evidence in the courts of the United States.—The Statutes of the United States provide:

> Extracts from the Journals of the Senate, or of the House of Representatives, and of the Executive Journal of the Senate when the injunction of secrecy is removed, certified by the Secretary of the Senate or by the Clerk of the House of Representatives, shall be admitted as evidence in the courts of the United States, and shall have the same force and effect as the originals would have if produced and authenticated in court.[3]

---

[1] Mr. Poindexter must have wished to enter this expression in the Journal, for he had the right of debate and frequently exercised it. (For an instance see Annals, March 12, 1812, pp. 1221–1224.)

[2] Second session Forty-eighth Congress, Record, pp. 1607–1609; Journal, p. 603.

[3] See Revised Statutes, sec. 895.

# Chapter LXXXV.

## THE QUORUM.[1]

1. Provision of the Constitution.  Section 2984.
2. Interpretation of the Constitutional provision.  Sections 2985-2994.
3. Ruling of Mr. Speaker Reed as to quorum present.  Sections 2995-3004.
4. Rule for counting a quorum and its interpretation.  Sections 2995-3005.[2]
5. Reestablishment of the Speaker's count.  Section 3006.[3]
6. Review of Senate practice.  Sections 3010-3013.[4]
7. Speaker's count final.  Section 3014.
8. Making the point of no quorum.  Sections 3015-3018.
9. All business, including debate, suspended by failure of quorum.  Sections 3019-3021.[5]
10. Failure of quorum in Committee of the Whole.  Sections 3022-3025.

**2984. A majority of the House constitutes a quorum to do business.—**The Constitution of the United States provides in Article 1, section 5, that—

A majority of each [House] shall constitute a quorum to do business.

**2985. Out of conditions arising between 1861 and 1891 the rule was established that a majority of the Members chosen and living constitutes the quorum required by the Constitution.—**On July 19, 1861,[6] Mr. Charles B. Sedgwick, of New York, moved the previous question on the engrossment of a joint resolution to provide for the selection of a site for the Naval Academy. Fifty-two Members having voted in favor of and 41 Members having voted against seconding the same, the Speaker[7] declared that the previous question was seconded.[8]

---

[1] A majority of a committee is a quorum.  Section 4548 of this volume.
Quorum of Senate sitting for impeachment trial.  Section 2063 of Volume III.
Senate counted during impeachment (a.)?  Section 2205 of Volume III.
As to quorum of managers in impeachment trial.  Section 2035 of Volume III.
[2] Principle that legislation decided by them may be counted.  Section 291 of Volume I.
[3] See also section 1608 of Volume III.
Illustration of former practice of ascertaining presence of.  Section 2738 of this volume.
[4] Elaborate Senate discussion.  Section 653 of Volume I.
[5] Oath administered to Members in absence of.  Sections 174-176 of Volume I.
Must be present before reading of Journal.  Section 2130 of this volume.
Motion to reconsider in absence of.  Sections 5626-5628 of Volume V.
Point of no quorum held dilatory.  Sections 5624-5626 of Volume V.
[6] First session Thirty-seventh Congress, Journal, p. 117; Globe, p. 210.
[7] Galusha A. Grow, of Pennsylvania, Speaker.
[8] The previous question no longer requires a second.  (See sec. 5468 of Vol. V of this work.)

2937. On March 7, 1838,[1] during the debate in Committee of the Whole on an appropriation bill, Mr. John Reed, of Massachusetts, said he had some remarks to make, but there was no House to make them to. The Chair then appointed tellers to count the House, when it was found that there were but 72 Members in their seats—not a quorum. So the committee rose and reported the fact to the House.

2938. On February 24, 1875,[2] the Speaker,[3] in the course of a decision, said:

If any gentleman raises the question that business is proceeding without the presence of a quorum, it is within the competence of the Chair to decide that a quorum is present; and he will not allow the business of the House to be interrupted by any dilatory proceeding. He assumes the responsibility for that purpose of declaring that a quorum is present, because no business can proceed without a quorum. Even a gentleman speaking is entitled to have a quorum present. If the point be raised, a gentleman addressing the Chair may be taken off the floor by any Member raising the point that no quorum is present.

2939. On February 12, 1877,[4] a question of order was raised that debate could not proceed without a quorum.

In the course of the discussion of the question Mr. Nathaniel P. Banks, of Massachusetts, a former Speaker, said:

If any Member states that a quorum is not present, the Speaker counts the House, as he is bound to do, and if a quorum is found not to be present, business is suspended and a motion for a call of the House may be made.

The Speaker[5] said: "The House is not a House without a quorum," and the debate was not permitted to proceed.

2940. On Wednesday, January 21, 1891,[6] the Journal of the proceedings of yesterday's sitting having been read, and the question being on its approval,

Mr. William McKinley, jr., of Ohio, demanded the previous question, when Mr. W. C. P. Breckinridge, of Kentucky, made the point of order that no quorum was present.

The Speaker[7] ruled that the point of order that no quorum was present could only be raised when that fact was established by a division.[8]

---

[1] Second session Twenty-fifth Congress, Globe, p. 224.
[2] Second session Forty-third Congress, Record, p. 1733.
[3] James G. Blaine, of Maine, Speaker.
[4] Second session Forty-fourth Congress, Record, pp. 1498, 1499.
[5] Samuel J. Randall, of Pennsylvania, Speaker.
[6] Second session Fifty-first Congress, Journal, p. 162; Record, p. 1630.
[7] Thomas B. Reed, of Maine, Speaker.
[8] The actual transaction is recorded as follows in the Record:
Mr. McKINLEY. Mr. Speaker——
The SPEAKER. The gentleman from Ohio [Mr. McKinley] is recognized.
Mr. BRECKINRIDGE, of Kentucky. I raise the question of order——
Mr. McKINLEY. I move the previous question.
Mr. BRECKINRIDGE, of Kentucky (continuing). That there is no quorum in the House to do business.
The SPEAKER. The gentleman from Ohio [Mr. McKinley] moves the previous question.
Mr. BRECKINRIDGE, of Kentucky. I raise the question of order that there is no quorum present.
The SPEAKER. That will be determined by the vote. As many as are in favor of ordering the previous question will say "aye."

Mr. J. Warren Keifer, of Ohio, said:

Mr. Chairman, I make the point of order that the gentleman from Illinois in charge of the bill has the floor, making a speech, and the distinguished gentleman from Mississippi is not entitled to take him off the floor.

After debate the Chairman[1] held:

The Chair is of opinion that a question of order involving the presence of a quorum may be raised, and the Chair will count to ascertain whether a quorum is present.

**2960.** A quorum not being present, no motion is in order but for a call of the House or to adjourn.—On February 5, 1846,[2] the House was in Committee of the Whole House on the state of the Union, considering joint resolution (No. 5) of notice to Great Britain to "annul and abrogate" the convention between Great Britain and the United States of the 6th of August, 1827, relative to the country "on the northwest coast of America, westward of the Stony Mountains," commonly called Oregon.  Finding itself without a quorum, the committee rose.  A motion to adjourn having been decided in the negative, on motion of Mr. George W. Jones, of Tennessee, a call of the House was ordered; and the roll having been called as far as the name of Stephen Adams, of Mississippi, a motion was made by Mr. Robert B. Rhett, of South Carolina, that further proceedings in the call be dispensed with.  And the question being put, it was decided in the affirmative.

A motion was made by Mr. Howell Cobb, of Georgia, that the House take a recess until 7.30 o'clock.

Mr. Robert C. Winthrop, of Massachusetts, raised the question of order that, a quorum of Members not being present, it was not competent for the Chair to entertain a motion for a recess.

The Speaker[3] decided that, it appearing from the record that there was not a quorum present, no motion was in order except for a call of the House or to adjourn.

In this decision the House acquiesced.

**2961.** The absence of a quorum having been disclosed, the only proceedings in order are the motions to adjourn or for a call of the House; and not even by unanimous consent may business proceed.—On May 24, 1872,[4] the House, while considering the bill of the Senate (No. 565) for the relief of Thomas B. Wallace, of Lexington, Mo., found itself without a quorum on the vote on the passage of the bill.  A call of the House was ordered, and then a motion to adjourn was defeated, a yea and nay vote being had on each of these motions.

At this point Mr. James A. Garfield, of Ohio, proposed that by unanimous consent further proceedings under the call be dispensed with, and that the bill be acted on by a rising vote, on the assumption that a quorum was present.

The Speaker pro tempore[5] said:

The vote upon the passage of this bill by yeas and nays has declared the fact that there is not a quorum in the House.  The House thereby becomes constitutionally disqualified to do further business,

---

[1] Edgar D. Crumpacker, of Indiana, Chairman.
[2] First session Twenty-ninth Congress, Journal, p. 363.
[3] John W. Davis, of Indiana, Speaker.
[4] Second session Forty-second Congress, Globe, p. 3855.
[5] Clarkson N. Potter, of New York, Speaker pro tempore.

except that business which the Constitution authorizes the House to do when a quorum is not present, to adjourn, or to order a call of the House, and the proceedings in respect to that bill fall, and the bill, should there be a quorum in the House, must again come before the House for its passage.

**2952. The absence of a quorum having been disclosed, there must be a quorum of record before the House may proceed to business.**—On February 28, 1849,[1] at an evening session, Mr. Caleb B. Smith, of Indiana, moved a resolution to close debate in Committee of the Whole on a bill to establish the Territorial government of New Mexico.

On this motion the question stood, ayes 41, noes 64, no quorum voting. On a motion for a call of the House no quorum voted.

Mr. Samuel F. Vinton, of Ohio, proposed that by common consent they go into committee and take up the amendments of the Senate to the Indian appropriation bill.

The Speaker[2] said the Chair was obliged to state to the gentleman from Ohio that the last two votes showed that there was no quorum present. There must be a quorum of record before the House could proceed to business.

**2953. On February 11, 1901,[3] Mr. James D. Richardson, of Tennessee, moved that the House adjourn.** The yeas and nays being demanded and ordered, there appeared, yeas 39, nays 33, answering present, 6.

The result being announced, Mr. William S. Knox, of Massachusetts, announced his purpose to call up a report of the Committee of the Whole House on the state of the Union, in relation to an occurrence in the committee.

The Speaker said:

The Chair, however, is compelled to take cognizance of the fact that the House is without a quorum and not in a position to do business.

**2954. The absence of a quorum being disclosed, a motion to fix the day to which the House shall adjourn may not be entertained.**

A motion which was by the rules more highly privileged than the motion to adjourn was not entertained after an affirmative vote on a motion to adjourn.

On February 21, 1894,[4] no quorum appearing, Mr. Richard P. Bland, of Missouri, moved that the House do now adjourn, pending which motion, Mr. J. Fred C. Talbott, of Maryland, moved that when the House adjourn to-day it be to meet on Friday next.

The Speaker[5] declined to entertain the motion of Mr. Talbott, for the reason that a quorum was required to decide it, the roll of the last preceding vote not having disclosed a quorum.

The question being put, Will the House adjourn? it was decided in the affirmative, yeas 141, nays 107.

Before the result of the foregoing vote was announced, Mr. Julius C. Burrows, of Michigan, moved that when the House adjourn to-day it be to meet on Friday next.

[1] Second session Thirtieth Congress, Globe, p. 634.
[2] Robert C. Winthrop, of Massachusetts, Speaker.
[3] Second session Fifty-sixth Congress, Record, pp. 2306, 2307.
[4] Second session Fifty-third Congress, Journal, p. 223.
[5] Charles F. Crisp, of Georgia, Speaker.

The Speaker[1] overruled the point of order on the ground that when the order was made the absence of a quorum was not disclosed by any proceeding in the House and did not appear in the Journal of the House, and that the statements of Members on the subject were merely expressions of their individual opinions.

**2002.** The absence of a quorum should appear from the Journal if a legislative act is to be vacated for such reason.—On June 3, 1858,[2] Mr. George W. Jones, of Tennessee, moved that the Journal of the preceding legislative day be amended by striking out the action of a bill filed by Mr. Edwards, there being no quorum present on that day.[3]

It was objected in opposition to this motion that the Journal of that day did not show the absence of a quorum; but Mr. Jones urged that it was a matter of common knowledge that there was no quorum present. This was not denied.

Various attempts to dispose of the motion were made, but failed for lack of a quorum until June 28, when Mr. Jones's motion was laid on the table, yeas 98, nays 24.

**2003.** When a vote taken by yeas and nays shows that no quorum has voted it is the duty of the Chair to take notice of that fact.—On June 5, 1884,[4] the House having under consideration a bill forbidding certain land grants, the yeas and nays were ordered and taken on the passage of the bill. After the vote had been taken the Speaker[5] announced that no quorum had voted and that the bill had not passed.

Upon the question being made by Mr. Poindexter Dunn, of Arkansas, that no Member had made the point that a quorum had not voted, the Speaker decided that when a vote was taken by yeas and nays it would be entered on the Journal of the House, and it was the duty of the Chair to take notice of the fact that a quorum had not voted and that the bill had not passed by a constitutional vote.

**2004.** The previous question having been ordered on a bill by unanimous consent in the absence of a quorum, the Speaker on the next day ruled that the action was null and void.—On February 19, 1873,[6] pending the demand for the previous question on the bill of the House (No. 2364) to provide for the recomputation of the accounts between the United States and the several States growing out of moneys expended by the States in the war of 1812, a quorum failed to vote and a call of the House was ordered. After the roll had been called, the doors closed, and excuse offered, on motion of Mr. Leonard Myers, of Pennsylvania, by unanimous consent, this order was agreed to.

*Ordered, That all further proceedings under the call be dispensed with, that the previous question shall be considered as ordered, and the main question ordered, upon the bill of the House (H. R. 2364) to provide for the recomputation of the accounts between the United States and the several States growing out of moneys expended by said States in the war of 1812, and that the House shall now adjourn.*

The House accordingly, at 12 o'clock m., adjourned.

On the next day, the Journal having been read, Mr. Nathaniel P. Banks, of Massachusetts, made the point of order that the main question on the bill of the

[1] Charles F. Crisp, of Georgia, Speaker.
[2] First session Thirty-fourth Congress, Journal, pp. 1039, 1056; Globe, pp. 1376, 1457.
[3] Formerly bills were introduced by leave, and a previous notice was required.
[4] First session Forty-eighth Congress, Journal, p. 1222.
[5] John G. Carlisle, of Kentucky, Speaker.
[6] Third session Forty-second Congress, Journal, p. 447; Globe, p. 1520.

House (No. 2954), having been ordered while the doors were closed, and, as appeared from the Journal, while less than a quorum was present, the order should be treated as a nullity.

The Speaker sustained the point of order, and in this decision of the Chair the House acquiesced.

The Speaker, in ruling, said:

It is clearly impossible under the rule to do that. Here was the documental, recorded fact that one hundred and forty gentlemen, more than one-half the whole number of Members, were about from the Hall. The doors were closed. There was no presumption possible by which the presence of a quorum could be inferred. And the gentleman from Massachusetts, Mr. Banks, raises an appropriate point of order, that it is impossible the House could perform a legislative act, under the rules, in the absence of a quorum. Aside from the obvious propriety of the matter, the rule is very distinct upon that point. It is in the order for the House even to take a recess during a call of the House, and indeed no motion except to adjourn, or with reference to the call, is ever entertained during a call. It was no more competent for the hundred gentlemen in the Hall to give their vote to the previous question than it was for them to pass an appropriation bill or do anything else of a legislative character. Therefore the Chair would rule on the point made by the gentleman from Massachusetts that the bill, on which the previous question was ordered merely by a minority of the House, is not before the House.

2985. The hour fixed by the rules for a recess having arrived, the Speaker declares the House in recess, although less than a quorum may be present.—On Friday, August 5, 1890, the House was voting by yeas and nays on the passage of a resolution reported from the Committee on Rules for fixing a time for the consideration of the Indian appropriation bill, when the hour of 5 p. m. arrived.

The roll call having been completed, the Speaker stated that no quorum had voted; but that under the rule the House would take a recess until 8 p. m.

2986. When a quorum fails in Committee of the Whole the roll is called and the committee rises and reports.

The quorum of the Committee of the Whole is 100.

Form and history of section 2 of Rule XXIII.

Section 2 of Rule XXIII provides—

Whenever a Committee of the Whole House or of the Whole House on the state of the Union finds itself without a quorum, which shall consist of 100 Members, the Chairman shall cause the roll to be called and thereupon the committee shall rise, and the Chairman shall report the names of the absentees to the House, which shall be entered on the Journal; but if on such call a quorum shall appear, the committee shall thereupon resume its sitting, without further order of the House.

It was the early practice of the Committee of the Whole to rise when it found itself without a quorum, and on December 18, 1847, this rule was adopted:

Whenever the Committee of the Whole on the state of the Union, or the Committee of the Whole House, finds itself without a quorum, the Chairman shall cause a roll of the House to be called, and thereupon the committee shall rise and the Chairman shall report the names of the absentees to the House, which shall be entered on the Journal.

---

[1] James G. Blaine, of Maine, Speaker.  When the order was made, on February 13, Mr. Luke P. Poland, of Vermont, was in the chair.

[2] First session Fifty-first Congress, Journal, p. 904; Record, p. 8382.

[3] Thomas B. Reed, of Maine, Speaker.

[4] Section 2 of Rule XXVI; see section 3221 of this volume.

[5] Section 2977 of this chapter.

[6] Globe, first session Thirtieth Congress, p. 47.

# Chapter XCI.

## BILLS, RESOLUTIONS, AND ORDERS.

1. Rules for introduction and reference of bills, petitions, etc.   Sections 2994–2999.
2. Form and practice in relation to bills and resolutions.   Sections 3000–3002.
3. Practice as to consideration of.   Sections 3003–3004.
4. Reading, amendment, and passage.   Sections 3005–3008.
5. Enrolling and signing of.   Sections 3009–3010.
6. Recall of bills from other House for correction of errors.   Sections 3020–3021.

2994. Petitions, memorials, and bills are introduced by the Member delivering them to the Clerk.

The reference of a private bill is indorsed on it by the Member introducing it, while the reference of a public bill is made by the Speaker.

Any petition or memorial of an obscene or insulting nature may be returned by the Speaker to the Member presenting it for reference.

Rules for correction of erroneous reference of private and public bills.

Petitions, memorials, and bills referred by delivery to the Clerk are entered on the Journal and Record.

The erroneous reference of a petition or private bill referred by the Member under the rule does not confer jurisdiction on the committee receiving it.

Sections 1, 2, and 3 of Rule XXII provide for the introduction, reference to committees, and change of reference of petitions, memorials, bills, and resolutions:

1. Members having petitions or memorials or bills of a private nature to present may deliver them to the Clerk, indorsing their names and the reference or disposition to be made thereof; and said petitions and memorials and bills of a private nature, except such as, in the judgment of the Speaker, are of an obscene or insulting character, shall be entered on the Journal with the names of the Members presenting them, and the Clerk shall furnish a transcript of such entry to the official reporters of debate, for publication in the Record.

2. Any petition or memorial or private bill excluded under this rule shall be returned to the Member from whom it was received; and petitions and private bills which have been inappropriately referred may, by direction of the committee having possession of the same, be properly referred in the manner originally presented; and an erroneous reference of a petition or private bill under this rule shall not confer jurisdiction upon the committee to consider or report the same.

3. All other bills, memorials, and resolutions may, in like manner, be delivered, indorsed with the names of Members introducing them, to the Speaker, to be by him referred, and the titles and references thereof and of all bills, resolutions, and documents referred under the rule shall be entered on

The Speaker replied:

Certainly not. In other words, it is in order to make the motion to discharge the committee from further consideration of the bill, and the motion which has been made is in order. Debate has been in order, but at the close of the debate, after the bill has been searched for on the files of the committee, and does not materialize, the vote can not be taken; the House can not act upon a bill of which it does not have manual possession.

The order proposed by Mr. Humphrey was then agreed to.

Later, on the same day, a message from the Senate transmitted the duplicate engrossed copy of the bill, and the vote was taken on the motion pending.

**3496. The House directed the return of a Senate bill not attested by the Secretary.**—On January 11, 1838,[1] Mr. Ratliff Boon, of Indiana, from the Committee on the Public Lands, reported the following resolution, which was agreed to by the House:

Resolved, That a message be sent to the Senate, returning the bill (No. 5) entitled "An act to authorize the States to tax any lands within their limits sold by the United States," sent to this House by that body, and informing them that the same is without the usual attestation of their Secretary, according to the fifth of the joint rules of the two Houses.[2]

**3497. The Secretary of the Senate having omitted to sign certain engrossed Senate bills before they were sent to the House, he was admitted to affix his signature.**—On July 5, 1838,[3] on motion of Mr. Elisha Whittlesey, of Ohio, it was—

Ordered, That the Secretary of the Senate be admitted to affix his signature to Senate bills numbered 88, 185, 234, and 235, and Senate Resolution No. 2, which were delivered to this House by said Secretary without his signature, which is required by the fifth joint rule.

**3498. The rules of the House do not require the report of a committee as to the accuracy of the engrossed copy of a bill.**—On August 23, 1892,[4] Mr. William E. Mason, of Illinois, made the point of order that the engrossed copy of the bill (H. R. 11568) defining lard and imposing a tax and regulating the sale, etc., of compound lard, which was being read, had not been compared, and that no committee had reported it as correctly engrossed.

The Speaker pro tempore[5] overruled the point of order on the ground that no rule[6] of the House required its comparison and report by a committee, and that, the engrossment being by the Clerk of the House, the presumption was that the bill was correctly engrossed.

Mr. Mason having appealed, the decision of the Chair was sustained.

**3499. The rule and practice as to the enrolling and signing of bills and their presentation to the President.**

Enrolled bills are signed first by the Speaker, then by the President of the Senate.

[1] Second session Twenty-fifth Congress, Journal, p. 264.
[2] The joint rules are no longer in force, but the practice of attesting bills in this manner prevails still.
[3] Second session Twenty-fifth Congress, Journal, p. 1246.
[4] First session Fifty-first Congress, Journal, p. 606; Record, p. 9104.
[5] Lewis E. Payson, of Illinois, Speaker pro tempore.
[6] On November 28, 1820, the House disagreed to a proposition for a rule creating a committee on engrossed bills. (Second session Sixteenth Congress, Journal, pp. 21, 24.)


332                PRECEDENTS OF THE HOUSE OF REPRESENTATIVES.                § 3458

Objection having been made, the following resolution was offered by Mr. John Dalzell, of Pennsylvania, and agreed to by the House:

Ordered, That the clerk be directed to return to the Senate the enrolled bill (S. 5339) providing for the sale of sites for manufacturing or industrial plants in the Indian Territory, with the information that the House has rescinded the request of the Senate that the House recede the action of the Speaker in signing said enrolled bill, and that the unanimous consent necessary to enable such action to be taken was refused.

3458. The Speaker may not sign an enrolled bill in the absence of a quorum.—On May 20, 1864,[1] Mr. Jacob Inschs, of Tennessee, from the Joint Committee for Enrolled Bills, reported that the committee had examined an enrolled bill entitled "An act making appropriations for the public buildings in Washington, and for other purposes," and had found the same to be duly enrolled.

When, a quorum not being present, objection was made by a Member to signing the said bill by the Speaker.[2]

And thereupon the House adjourned.

3459. Proceedings in correcting an error where the Speaker had signed the enrolled copy of a bill that had not passed.—On March 14, 1864,[3] the Speaker stated to the House that—

the Secretary of the Senate having inadvertently, on Friday last, announced the passage by the Senate of the Court of Claims bill No. 118, instead of the bill of the House (H. R. 118), and having since recanted said error by certifying to the bill which actually did pass, the Speaker, with the consent of the House, will cause the Journal of that day to be amended by the insertion of the title of the bill which actually passed, in lieu of the one originally announced; and when signed by the committee he will sign the proper enrolled bill, cancelling his signature of H. R. C. C. 118.

The unanimous consent of the House was given to the course indicated by the Speaker.[4]

3460. It is a common occurrence for one House to ask of the other the return of a bill, for the correction of errors or otherwise.—On April 11, 1810,[5] the House proceeded to consider the amendments of the Senate to the bill entitled "An act regulating the Post-Office Establishment."

Mr. Ezekiel Bacon, of Massachusetts, moved that the following words, "Section 25, lines 2 and 3, strike out the words 'each postmaster, provided each of his letters or packets shall not exceed half an ounce in weight,'" appearing to have been an interpolation in the amendments sent from the Senate after the same was received by this House, be expunged therefrom.

Pending consideration a message was received from the Senate requesting the return of the bill and amendments,

it having been discovered that an inaccuracy had taken place in stating the amendment of the Senate.

The House ordered the bill returned, and the same day a message from the Senate returned to the House the corrected amendments.

[1] First session Nineteenth Congress, Journal, p. 439.
[2] John W. Taylor, of New York, Speaker.
[3] First session Thirty-eighth Congress, Journal, p. 377; Globe, p. 1094.
[4] Schuyler Colfax, of Indiana, Speaker.
[5] Second session Eleventh Congress, Journal, pp. 385, 386 (Gales and Seaton ed.); Annals, pp. 619 (Vol. I) and 1769 (Vol. II).

# Chapter XCII.

## APPROVAL OF BILLS BY THE PRESIDENT.

1. Provision of the Constitution.  Section 3482.
2. As to resolutions requiring approval.  Sections 3483, 3484.
3. Bills approved are deposited with the Secretary of State.  Section 3485.
4. Delay in presenting bills to President.  Sections 3486-3488.[1]
5. Practice of the President in approving.  Sections 3489-3492.
6. Approval after adjournment for a recess.  Sections 3493-3494.
7. Exceptional instances of approval after final adjournment.  Section 3497.
8. Error in approval.  Section 3498.
9. Notification of the House as to approvals.  Sections 3499-3504.
10. Return of bills by President for correction of errors.  Sections 3505-3510.

3482.  Every bill which has passed the two Houses is presented to the President for his signature if he approves.

In general, orders, resolutions, and votes in which the concurrence of the two Houses is necessary must be presented to the President on the same condition as bills.

A concurrent resolution providing for final adjournment of the two Houses is not presented to the President for approval.

The Constitution of the United States, in section 7 of Article I, provides:

Every bill which shall have passed the House of Representatives and the Senate shall, before it becomes a law, be presented to the President of the United States; if he approve, he shall sign it, etc.

Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States, and before the same shall take effect shall be approved by him, or, being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill.

3483.  Although the requirement of the Constitution seems specific, the practice of Congress has been to present to the President for approval only such concurrent resolutions as are legislative in effect.—On January 27, 1897, Mr. David B. Hill, of New York, from the Committee on the Judiciary, submitted to the Senate a report[2] which that committee had been directed to make on the subject of joint and concurrent resolutions and their approval by the President. The subject involved the construction of a portion of section 7 of Article I of the

[1] Method of taking enrolled bills to the President.  Section 3494 of Volume III.
[2] Senate Report No. 1335, second session Fifty-fourth Congress.

339

Within the experience of the Chair in the Senate no concurrent resolution has ever been sent to the President of the United States, nor has he ever signed one. The Chair has endeavored faithfully to find out how concurrent resolutions escape the purview of the Constitution. He has not been able to succeed.

This led to debate in the course of which the report of the Judiciary Committee in a former Congress was quoted with approval.[1]

**3485.** A statute requires that bills signed by the President shall be received by the Secretary of State from the President.

When a bill returned without the President's approval is passed by the two Houses, the Secretary of State receives the bill from the presiding officer of the House in which it last was passed.

The act approved December 28, 1874,[2] provides:

Whenever a bill, order, resolution, or vote of the Senate and House of Representatives, having been approved by the President, or not having been returned by him with his objections, becomes a law or takes effect, it shall forthwith be received by the Secretary of State from the President; and whenever a bill, order, resolution, or vote is returned by the President with his objections, and on being reconsidered is agreed to be passed and is approved by two-thirds of both Houses of Congress, and thereby becomes a law or takes effect, it shall be received by the Secretary of State from the President of the Senate or Speaker of the House of Representatives, in whichever House it shall last have been so approved, and he shall carefully preserve the originals.

**3486.** Instance wherein a bill enrolled and signed by the presiding officers of the two Houses of one session was sent to the President and approved at the next session.—On December 5, 1904,[3] Mr. Frank C. Wachter, of Maryland, chairman of the Committee on Enrolled Bills, offered the following:

Whereas the bill (H. R. 10000) for the relief of Edward J. Farrell passed both Houses at the second session of this Congress, but was enrolled too late to receive the signatures of the presiding officers of the two Houses and be presented to the President of the United States before the adjournment of the said second session; and

Whereas the bill (H. R. 11000) to grant certain lands to the State of Ohio passed both Houses and was signed by the presiding officers thereof, but failed to be presented to the President of the United States before the adjournment of the said second session: Therefore,

*Resolved by the House of Representatives (the Senate concurring),* That the said bills be, and are hereby, ordered to be reenrolled for the signatures of the presiding officers of the two Houses and for presentation to the President of the United States.

The resolution was agreed to by the House.

On December 12,[4] in the Senate, the resolution was referred to the Committee on Rules and was not reported therefrom.

The Senate having taken no action on the resolution, the bill (H. R. 10516) was reenrolled as of the third session, signed by the presiding officers, and transmitted to the President, who signed it.[5]

---

[1] See section 3482 of this chapter.

[2] 18 Stat. L., p. 294. A law on this subject had existed from 1789 and had been amended in 1820. (See sec. 204 of Revised Statutes.)

[3] Third session Fifty-eighth Congress, Record, p. 63.

[4] Record, p. 126.

[5] See history of bill (H. R. 10516) in Indexes of Journal and Record.

Case 2:10-cr-00520-JCM -RJJ   Document 40-2   Filed 07/12/12   Page 45 of 88

and figures 'approved March 12, 1863,' are in the handwriting of the President, and followed by his signature."

Thus it appears, from the original files in the State Department, that said act was approved March 12, 1863, and this is true, in fact, as to the date of approval.

The section of the Constitution of the United States bearing upon this question reads as follows:

"If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress, by their adjournment, prevent its return, in which case it shall not be a law."

The committee are informed that in the great press of business immediately preceding the adjournment of Congress on the 4th of March, 1863, the act which is made the subject-matter of inquiry by the resolution of the House was passed to the Secretary of the Treasury for examination, as it related particularly to his Department. It did not reach the President again until after the adjournment of Congress, when it was approved by him under the belief that the last clause of the section of the Constitution, above quoted, was designed more especially to prevent Congress from enacting laws without the approval of the Executive, which might be done by the passage of bills by the two Houses, followed by an adjournment, before the President could examine and return them, were it not for the declaration that in such cases the bills shall not be laws; and did not relate to cases wherein the Executive should approve bills sent to him by Congress within ten days, even though an adjournment should occur before the return of the bills.

That there is force and plausibility in this position, a little reflection will discover to any mind; but the committee can not receive it as a correct interpretation of the Constitution.

The ten days' limitation contained in the section above quoted refers to the time during which Congress remains in session, and has no application after adjournment. Hence, if the Executive can hold a bill ten days after adjournment, and then approve it, he can as well hold it ten months before approval. This would render the laws of the country too uncertain, and could not have been intended by the framers of the Constitution.

The spirit of the Constitution evidently requires the performance of every act necessary to the enactment and approval of laws to be perfect before the adjournment of Congress.

The committee, therefore, conclude that the act referred to, approved March 12, 1863, is not in force; and in this conclusion the committee are unanimous.[1]

**3498. A bill that had not actually passed, having been enrolled and signed by the President of the United States, was disregarded by the Executive, and Congress passed another bill.**—On March 11, 1834,[2] the House considered a joint resolution (No. 3) to place the name of Benedict Alford on the pension roll. The Debates of March 18,[3] give the following explanation of the presentation of this resolution:

At the first session of the Twenty-third Congress a bill passed the House of Representatives granting pensions to Benedict Alford and Robert Burch, soldiers of the Revolutionary war. By the Journals of the Senate it appears that this bill was indefinitely postponed in that body, and the House of Representatives was so notified. And it is also so entered on the Journal of the House. The postponement of the bill in the Senate in the last hour of the session was inadvertently overlooked by the enrolling clerk, as well as by the Committee on Enrolled Bills in the House, and it was enrolled and signed by the officers of the two Houses, and presented to, and approved by, the President. A few days after the adjournment of Congress the error was discovered in the Clerk's office in the House of Representatives, and notice of the fact was immediately given to the War Department. The Secretary of War thereupon declined complying with the provisions of the bill, under the conviction that it was not a valid statute. At the last session of Congress the President communicated the fact to the Senate by message. No

[1] The act of July 2, 1864 (13 Stat. L., p. 378), was amendatory of the act "approved March 12, 1863," thereby indicating that the latter act was still considered a law. (See Globe, first session, thirty-eighth Congress, p. 3583, for debate on the bill S. 222.)

[2] First session Twenty-fourth Congress, Journal, pp. 476, 493, 524, 532; Debates, pp. 2947, 3253.

[3] Debates, p. 2852.

action in the case was, however, had in either House at the last session.   At the present session Benedict Alford again presented his petition, which was referred to the Committee on Revolutionary Pensions. The committee reported that, in its opinion, the act was a valid one, and that no further legislation was necessary to give a pension to the petitioner, which, in their opinion, the Secretary of War was bound to pay him.   A member of the committee, differing with the majority, after the report was made, moved the resolution directing the Secretary of War to execute the act, which had passed in the manner herein stated.

The subject was elaborately discussed on March 11 and 18, and after various methods of procedure had been proposed, the House finally—

*Resolved*, That the joint resolution to place the names of Benedict Alford and Robert Brush on the pension list be referred to the Committee on Revolutionary Pensions, with instruction to report a bill for the relief of Benedict Alford and Robert Brush.

Such a bill was duly reported and became a law.[1]

**3499.** The President sometimes, at the close of a Congress, informs the House as to both the bills he has signed and those he has allowed to fail.—In 1873, on March 3,[2] the last day of the session and the Congress, the President sent a message to the House giving notice both of the bills that he approved,[3] and also of those which did not receive his signature and failed to become laws.

**3500.** On December 14, 1842,[4] President Tyler sent a message to the House informing that body that he had failed to sign two bills at the close of the preceding session of Congress—the bill relating to the sale of the public lands and the granting of preemption rights, and the bill regulating the taking of testimony in contested election cases.   The President abstained from expressing an opinion as to the merits of these bills which had thus failed to become laws, but stated that they were sent to him too late for him to have time to read them through and sign them.   He expressed a strong opinion in favor of an adherence to the then existing joint rule of the two Houses which prohibited the presentation of a bill to the President on the last day of the session.

**3501.** On December 15, 1842,[5] President Tyler communicated to the House his reasons for withholding his signature from the bill "directing payment of the certificates of awards issued by the commissioners under the treaty with the Cherokee Indians."   This bill had been sent to the President in the closing hours of the previous Congress, and had consequently failed to become a law.

**3502.** On December 6, 1832,[6] President Jackson transmitted to the House of Representatives a message stating his objections to the bill "for the improvement of certain harbors and the navigation of certain rivers," which was not received by him a sufficient length of time before the close of the last session to enable him to examine it before adjournment, and from which he had withheld his signature, so that it had not become a law.

It does not appear that any action was taken on this message.

---

[1] Journal, pp. 688, 890, 892.
[2] Third session Forty-second Congress, Journal, p. 595; Globe, p. 2257.
[3] The President by message informs the House from time to time of bills which he has approved.
[4] Third session Twenty-seventh Congress, Journal, p. 57.
[5] First session Twenty-eighth Congress, Journal, p. 62.
[6] Second session Twenty-second Congress, Journal, p. 24; Debates, p. 819.

4787. At an informal rising of the Committee of the Whole a message from the President of the United States may be laid before the House only by unanimous consent.—On June 12, 1902,[1] the Committee of the Whole House on the state of the Union san informally to receive message from the President of the United States.

The message having been communicated to the House, the Speaker[2] said:

If there is no objection, the Chair will lay the message before the House.

Mr. Oscar W. Underwood, of Alabama, objected.

Thereupon the Speaker said:

Objection being made, the Committee of the Whole will resume its sitting.

4788. Sometimes on the informal rising of the Committee of the Whole, the House, by unanimous consent, transacts business, such as the presentation of enrolled bills, the swearing in of a Member, or consideration of a message.—On February 23, 1899,[3] the Committee of the Whole informally sau, and Mr. James Pike, of New Hampshire, from the Committee on Enrolled Bills, reported that they had examined and found truly enrolled certain bills.

Thereupon the Speaker[4] signed the same; and the committee then resumed its session.[5]

4789. On May 5, 1868,[6] the Committee of the Whole informally rose to receive a message from the Senate. The message having been read, Mr. Martin Maginnis, of Montana, asked the House to concur in a verbal amendment to one of the bills just received from the Senate.

The Speaker[7] said:

The rising of the committee is informal. That request can not now be entertained.

4790. On May 14, 1896,[8] the Committee of the Whole informally rose to receive a message from the Senate, one of the announcements of which was that the Senate had passed with amendments a bill (H. R. 7977) making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes, asked a conference with the House of Representatives on the bill and amendments, and had appointed Mr. Frye, Mr. Quay, and Mr. Vest as the conferees on the part of the Senate.

As soon as the reading of the message was concluded, Mr. Binger Hermann, of Oregon, asked unanimous consent that the Senate amendments to this bill be

---

[1] First session Fifty-seventh Congress, Record, p. 6742.

[2] David B. Henderson, of Iowa, Speaker.

[3] Second session Thirty-fifth Congress, Globe, p. 1417.

[4] James L. Orr, of South Carolina, Speaker.

[5] It is quite common for the committee to rise informally for this purpose. (See Record, first session Fifty-first Congress, p. 3582; first session Fifty-fifth Congress, p. 557; and first session Fifty-first Congress, p. 7774. In the latter case conferees also were appointed.)

[6] Second session Forty-ninth Congress, Record, p. 3388.

[7] Samuel J. Randall, of Pennsylvania, Speaker.

[8] First session Fifty-fourth Congress, Record, pp. 3249, 3274, 6592.

59th Congress }     HOUSE OF REPRESENTATIVES     { Document
   2d Session }                                       { No. 355

# HINDS' PRECEDENTS

### OF THE

# HOUSE OF REPRESENTATIVES

### OF THE

# UNITED STATES

## INCLUDING REFERENCES TO PROVISIONS OF THE CONSTITUTION, THE LAWS, AND DECISIONS OF THE UNITED STATES SENATE

By

### ASHER C. HINDS, LL. D.

Clerk at the Speaker's Table

## VOLUME V

PUBLISHED BY AUTHORITY OF THE ACT OF CONGRESS
APPROVED MARCH 4, 1907

WASHINGTON
GOVERNMENT PRINTING OFFICE
1907

**6684.** On December 20, 1858,[1] the Senate sent to the House the following resolution, which was, after considerable opposition, agreed to by the House:

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That when the two Houses adjourn on the twenty-third instant they adjourn to meet on Tuesday the fourth of January next.*

**6685.** In 1866[2] the subject of the holiday recess by adjournment of both Houses for more than three days was discussed at length in the Senate. It had not then become established as a custom, but was favored by the majority because Members could not be induced to remain in Washington, and so the recess would have to be taken by three day adjournments if not by concurrent action.

From 1866 onward the practice of taking the holiday recess has been more constant; but in 1882[3] the Senate disagreed to the concurrent resolution of the House proposing a holiday recess, and the two Houses by separate action merely adjourned from the 22d to the 27th.[4]

In 1895[5] also, the holiday recess was omitted; but as in 1882 the action was exceptional.

**6686.** The two Houses may by concurrent resolution provide for an adjournment to a certain day, with a provision that if there be no quorum present on that day the session shall terminate.

The two Houses have the power to provide that their presiding officers shall declare an adjournment sine die in case that after a recess a quorum shall be lacking in either House.

The process whereby the Fortieth Congress prolonged its first session by successive recesses, with a provision for adjournment sine die in a certain contingency.

On March 29, 1867,[6] the House agreed to this concurrent resolution, which had already been agreed to by the Senate:

*The President of the Senate and the Speaker of the House of Representatives are hereby directed to adjourn their respective Houses on Saturday, March 30, 1867, at 12 o'clock m., to the first Wednesday of July, 1867, at noon, when the roll of each House shall be immediately called, and immediately thereafter the presiding officer of each House shall cause the presiding officer of the other to be informed whether or not a quorum of its body has appeared, and, thereupon, if a quorum of the two Houses respectively shall not have appeared upon such call of the roll, the President of the Senate and the Speaker of the House of Representatives shall immediately adjourn their respective Houses without day.[7]*

On March 30, 1867, the hour of 12 o'clock m. having arrived, the Speaker, in accordance with the concurrent resolution of the two Houses, declared the first

[1] Second session Thirty-fifth Congress, Journal, pp. 83, 91; Globe, pp. 138, 158.
[2] Second session Thirty-ninth Congress, Globe, p. 131.
[3] Second session Forty-seventh Congress, Record, pp. 490–494.
[4] Record, pp. 630, 683.
[5] First session Fifty-fourth Congress.
[6] First session Fortieth Congress, Journal, pp. 137, 168, 184; Globe, pp. 454, 560.
[7] This resolution was adopted after prolonged disagreement between the two Houses. (First session Fortieth Congress, Journal, pp. 139, 146, 148; Globe, pp. 438, 454.) On July 3, 1867, in the Senate, Mr. Charles Sumner, of Massachusetts, made a protest against the constitutionality of it. (First session Fortieth Congress, Globe, pp. 493, 494.)

session of the Fortieth Congress adjourned to the first Wednesday of July next, at noon.

On Wednesday, July 3,[1] the two Houses met, and on July 11 Mr. George S. Boutwell in the House submitted this resolution:

*Resolved (the Senate concurring),* That the two Houses of Congress shall adjourn on the —— day of July instant; the adjournment shall be to Wednesday, the 16th day of October next, at noon, and the two Houses shall then reassemble without further order.[2]

To this Mr. Rufus P. Spalding, of Ohio, offered the following amendment as a substitute:

That the President of the Senate and the Speaker of the House are hereby directed, upon the adjournment of their respective Houses, to adjourn the same to the 16th day of October, 1867, at 12 o'clock m., when the roll of each House shall be called, and immediately thereafter the presiding officer of each House shall cause the presiding officer of the other to be informed whether or not a quorum of its body has appeared; and thereupon, if a quorum of the two Houses respectively shall not have appeared upon such call of the roll, the President of the Senate and the Speaker of the House of Representatives shall immediately adjourn their respective Houses without delay.

Against this amendment Mr. Robert C. Schenck, of Ohio, raised a point of order, saying:

Congress has powers prescribed by the Constitution. They are general when Congress finds itself with a quorum in each body composing Congress prepared to do business. There is a special power when that case does not occur and when each House finds itself without a quorum. How is it when there is not a quorum present? The Constitution then intervenes and makes a rule. When Congress finds itself assembled without a quorum in either branch the Constitution prescribes what it can do, what it may do, what if it chooses it must do, but gives no latitude to any other body, or to the body itself, outside of its action when the case occurs, to prescribe in advance that it shall do certain things and only certain things. I say that the power of Congress, therefore, to take a recess or to adjourn is limited to fixing the time when it shall reassemble; and when reassembled the Constitution intervenes, and if there be a quorum present, provides that it may go on and exercise its general powers; but if there be no quorum, that it shall have the specific power to adjourn from day to day and compel the attendance of absent Members. An attempt, therefore, to prescribe in advance a rule by which you shall disarm the Congress of the United States of its power to legislate, or of its power to compel the attendance of absent Members, is to substitute your rule for the Constitution.

The Speaker,[3] before ruling, had read the fourth clause of the fifth section of the Constitution:

Each House shall be the judge of the election, returns, and qualifications of its own Members, and a majority of each shall constitute a quorum to do business. But a smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent Members in such manner and under such penalties as each House may provide.

---

[1] On July 3, 1867, when the House assembled after a recess that had begun on March 30 preceding, as soon as the roll had been called and the presence of a quorum ascertained, resolutions were adopted notifying the President pro tempore of the Senate and the President of the United States of that fact. The President pro tempore of the Senate was notified instead of the Senate, probably because of the terms of the concurrent resolution by which Congress had taken the recess. (First session Fortieth Congress, Journal, p. 161: Globe, 469.)

[2] This was at the time of a conflict between Congress and the President, when the two Houses did not wish to leave the President in full control of the Government.

[3] Schuyler Colfax, of Indiana, Speaker.

**The Speaker then said:**

The first part of that clause declares that "each House shall be the judge of the election, returns, and qualifications of its own Members, and a majority of each shall constitute a quorum to do business." This is the broad charter given in the Constitution by which the two Houses transact all their legislative business. It includes, of course, within its range of power the authority to lay down as rules of business, to decide when they shall meet, and what business they shall or shall not take up when they do meet. This is the power conferred by the Constitution upon a quorum of each House.

The clause then concludes by giving certain powers to less than a quorum. "A smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent Members, but in such manner and under such penalties as each house may provide." They must, therefore, compel the attendance of absent Members in such manner as each House (which means a quorum thereof) shall have provided anterior to that time. It follows, the Chair thinks, as the Chair understands, by the plain reading of the Constitution, that a minority of each House, less than a quorum, can not have, as the gentleman from Ohio (Mr. Schenck) argues, larger power than a majority of each House sitting as a legislative body. If the point of order made is correct, less than a quorum has more power than more than a quorum, an anomaly never recognized by parliamentary law nor conferred by the Constitution, in the opinion of the Chair. The limitation of the power of less than a quorum is absolute. They may do certain things in such manner and form and under such penalties as each House (which means a majority thereof) shall have previously provided.

The Chair, therefore, overrules the point of order on three grounds: First, that both Houses of Congress, at the opening meeting of the first session of this Congress, considered this provision of the Constitution, when it declared for exactly such an adjournment as is provided for in the pending resolution. That is a parliamentary precedent not questioned at that time, as the Chair understands, by any Member in either branch—certainly not appealed from in either branch—but spoken of latterly, when it was supposed there might not be a quorum present on the 3d day of July.

The Chair overrules it for a second reason, which is, that a majority of each House, when there was a quorum present, have determined that when Congress assembled on the 3d of July, if there was not a quorum present the absent Members should not be coerced, but that the presiding officers of both branches, who were simply the organs and servants of the two Houses to execute their orders, should then adjourn Congress without day, with full notice to every Senator and Representative of what would be the specific order of business on the 3d day of July, and what would be the result if a majority of either House failed to appear on that day.

The Chair overrules it on the third ground, that at the conclusion of long sessions the two Houses have sometimes provided for an adjournment to a specified day and hour, but that after a certain date only formal business, such as the signing of bills, shall be transacted, and at the final adjournment of such first session less than a quorum has been present.

If the point of order made by the gentleman from Ohio be correct, then if there were no quorum present at such a time the absence of a quorum would render null the concurrent resolutions of quorums of both the House and the Senate.

Mr. Schenck having appealed, the Chair was sustained, yeas 125, nays 14.

On July 20,[1] the Congress took another recess until November 21. When it reassembled the roll of the House was not called, and no notice of the presence of a quorum was sent to either Senate or House. The Speaker (Mr. Colfax) also assumed that the first business in order was the reading of the Journal of the last day before the recess.

**6687. A recess of Congress is a real, not imaginary time, when it is not sitting in regular or extraordinary session.**

[1] First session Fortieth Congress. Journal, p. 263; Globe, p. 769. The resolution providing for this recess was in the ordinary form, providing simply that the presiding officers adjourn their respective Houses to meet on November 21. (Journal, p. 230.)

vious Congress had adopted a resolution that they should not do so, but no such resolution had been adopted in the present one, so the remarks would be reported.

6979. A Member having uttered disorderly words on the floor without objection, the House was not thereby precluded from action when, after being withheld for revision, the words were printed in the Record.— In the Congressional Record of September 14, 1890, Mr. Robert P. Kennedy, of Ohio, published a speech which he had made on the floor of the House on September 3, and which contained certain unparliamentary references to the United States Senate.

6980. On September 15,[1] Mr. Benjamin A. Enloe, of Tennessee, claiming the floor for a question of privilege, proposed the following resolution:

> *Resolved,* That the Clerk of the House of Representatives be, and he is hereby, directed to communicate to the Senate the fact that the House reprobates and condemns the unparliamentary language of Hon. Robert P. Kennedy, a Representative from the State of Ohio, published in the Congressional Record of September 14, 1890, purporting to be a speech delivered on the floor of the House September 3, 1890, in which revised and amended speech he repeats his impeachment of honesty of Senators individually and of the Senate as a body.

Mr. Charles H. Grosvenor, of Ohio, made the point of order that this resolution did not come in here as a matter of privilege under the circumstances which surrounded it.

> Whenever the gentleman from Ohio [Mr. Kennedy] had proceeded without interruption to the close of his speech and the House had adjourned, that was the end of any point of order against the character of the utterances contained in that speech. He could not be called in question afterwards; for the language of the rule of the House is that, unless the language is taken down and objection is made at the time, the Member shall not thereafter be called to account for his utterances.

Mr. Grosvenor referred to the rules of the House which provide in section 5 of Rule XVI:

> 5. If a Member is called to order for words spoken in debate, the Member calling him to order shall indicate the words excepted to, and they shall be taken down in writing at the Clerk's desk and read aloud to the House: but he shall not be held to answer, nor be subject to the censure of the House therefor, if further debate or other business has intervened.

Mr. Enloe replied that Mr. Kennedy might not be censured for his utterances on the floor; but he had by his publication of the speech in the Record repeated the offense.

In the debate, which continued on September 16,[2] it was assumed that a certain revision had been made by Mr. Kennedy in his remarks as actually uttered; but that this revision was in the nature of lessening the severity of the language.

Mr. Thomas M. Bayne, of Pennsylvania, suggested an amendment providing for striking out the speech from the permanent Record.

---

[1] First session Fifty-first Congress, Record, pp. 10063, 10072.

[2] Jefferson's Manual, in Chapter XVII, also refers to English precedents which, however, refer to a time before legislative proceedings were reported: When any Member has spoken, or other business intervened, after offensive words spoken, they can not be taken notice of for censure. And this is for the common security of all, and to prevent mistakes which must happen if words are not taken down immediately. Formerly they might be taken down at any time the same day. (2 Hats., 196; Mem. in Hakew., 71; 3 Grey, 48; 9 Grey, 514.)

[3] Record, pp. 10100–10109.

Monument was celebrated by ceremonies, of which a part was an address delivered in the Hall of the House of Representatives on February 22, 1885,[1] by Hon. Robert C. Winthrop. The exercises were arranged in terms of a joint resolution, which also provided for a commission, consisting of five Senators, eight Representatives (to be appointed respectively by the presiding officers of their respective Houses), three members of the monument society, and the engineer in charge of the work. This commission was to arrange for the ceremonies.

**7060. The centennial of the inauguration of George Washington was observed by exercises at a joint session of the two Houses.**—On December 11, 1889,[2] the joint committee of the two Houses, appointed in pursuance of the act of March 2, 1889, reported to the House the order of arrangements for the ceremony of that day in commemoration of the inauguration of George Washington, first President of the United States. This programme provided the usual regulations for the admission to the Capitol, the occupation of the floor and galleries of the Hall of the House, where the exercises were to take place, for the seating of the President and ex-Presidents, the Supreme Court, the Cabinet, the Senators, the General of the Army and Admiral of the Navy, etc.

The Vice-President occupied the Speaker's chair and presided, the Speaker sitting at his left.

At the appointed hour the Senate and other bodies and individuals arrived, a message having been sent by the House to the Senate that the House was ready to receive the Senate. The orator of the occasion, Melville W. Fuller, Chief Justice, was escorted to the Clerk's desk by the chairman of the joint committee on the part of the House and Senate.

The opening invocation was by the Chaplain of the Senate, and the benediction by the Chaplain of the House.

At the close of the exercises the bodies and invited guests retired from the Hall in an order the inverse of that in which they entered.[3]

**7061. The House sometimes accepts invitations to attend public exercises, but does not go as an organized body.**—On May 7, 1884,[4] the House agreed to this resolution:

*Resolved,* That the House of Representatives will, at 1 o'clock p. m. on Saturday, May 10, attend as a body the ceremonies of unveiling the statue of John Marshall, late Chief Justice of the United States.

---

[1] First session Forty-eighth Congress, Record, p. 3977.

[2] First session Fifty-first Congress, Journal, p. 13; Record, p. 146. The programme appears in the Record.

[3] On December 20, by concurrent resolution, the thanks of Congress were tendered to the orator for his oration. (Journal, p. 74.) By the act of March 2, 1889 (25 Stat. L., p. 980), a joint committee composed of five Senators and five Representatives, to be appointed by the presiding officers of their respective Houses, and to be Members of the Fifty-first Congress, was appointed to have charge of the centennial of the inauguration of the first President. This committee made a joint report (first session Fifty-first Congress, Record, pp. 146, 147) which prescribed the order of exercises. These exercises occurred in the Hall of the House, in the presence of the Senate, Supreme Court, diplomatic corps, President and Cabinet, and other invited guests.

[4] First session Forty-eighth Congress, Journal, p. 1290; Record, pp. 3949, 4056.



COPY

Reproduced at the National Archives

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

# To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and exact copy of documents in his custody.

| SIGNATURE | | |
|-----------|--|--|
| NAME  Richard H. Hunt | | DATE  11/20/08 |
| TITLE  Director  Center for Legislative Archives | | |
| NAME AND ADDRESS OF DEPOSITORY  The National Archives  Washington, D.C. 20408 | | |

NA FORM APR 85 1407-A



79th Congress, 2d Session — — — — — — — House Document No. 761

# CONSTITUTION
# JEFFERSON'S MANUAL
### AND
# RULES OF THE HOUSE OF
# REPRESENTATIVES

#### OF THE UNITED STATES
##### EIGHTIETH CONGRESS

By

## LEWIS DESCHLER
##### PARLIAMENTARIAN

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1947

# PREFACE

The parliamentary practice of the House of Representatives emanates from four sources: First, the Constitution of the United States; second, from Jefferson's Manual; third, from the rules adopted by the House itself from the beginning of its existence; and, fourth, from the decisions of the Speakers of the House and from decisions of the Chairmen of the Committee of the Whole.

In the early history of the House the membership of that body frequently found it difficult to accomplish the purposes upon which they had determined. The Constitution directed the House to do certain things in a specified manner, and to do things not set forth specifically it gave the House carte blanche to make such rules as it thought necessary to carry out the purposes of a legislative body. The early Congresses, therefore, naturally borrowed from the English Parliament many of its practices. In the years following, these practices were adapted to meet the needs of our then youthful House. Special needs of the House have caused some of the motions adopted from the English system to lose their original form and purpose. They have evolved into a distinctly American system of procedure.

In the years from 1797 to 1801 Thomas Jefferson, then Vice President of the United States and President of the Senate, prepared the notable work which has come to be known as Jefferson's Manual. This work contributed greatly to the procedure of the House, although it was not

[v]

until 1827 that the House finally adopted a rule, which is still in existence, permitting the provisions of the Manual "to govern the House in all cases to which they are applicable."

From the beginning of the First Congress the House has formulated rules for its procedure. Some of them have since gone out of existence. More of them have been amplified and broadened to meet the exigencies that have arisen from time to time. To-day they are perhaps the most finely adjusted, scientifically balanced, and highly technical rules of any parliamentary body in the world. Under them a majority may work its will at all times in the face of the most determined and vigorous opposition of a minority.

The rulings of the Speakers of the House and of the Chairmen of the Committee of the Whole are to the rules of the House what the decisions of the courts are to the statutes. It is rare, indeed, for a question to arise that has not been decided at some prior time. All of these decisions have been embodied in the monumental work of the Hon. Asher C. Hinds and the Hon. Clarence Cannon, former Parliamentarians of the House. These rulings, which aggregate more than 11,000 in number, cover practically every situation that may arise.

I believe that I am not making too broad a statement when I say that the parliamentary practice of the House is a system of procedure that ranks second to none. It has proven adequate to meet all the emergencies that have arisen in the past. It will meet the emergencies and problems of the future with the same degree of success.

In this edition of the House Rules and Manual there is included in the manner hereinafter described the text of the Legislative Reorganization Act of 1946. The provisions of that act specifically amending Rules X, XI, XII, and XXI have been placed within the standing rule structure. Part 3 of Title I of the act, containing the provisions

applicable to both Houses, has been inserted at the end of the standing rules. Titles II through VI of the act, containing the statutory provisions relating to congressional personnel, lobbying regulations, Federal tort claims, bridges, compensation and retirement of Members of Congress have been inserted where "Important Decisions" have heretofore been found. "Important Decisions" have been eliminated in this edition as they are now set out in full in Cannon's Precedents of the House of Representatives.

Rulings of the Speakers and Chairmen of the Committee of the Whole which are of significance have been inserted under the rule which governed the decision of the Chair.

References are to Hinds' and Cannon's Precedents, the Congressional Record, and the United States Reports.

LEWIS DESCHLER.

JANUARY 3, 1947.

# CONTENTS.

Memorandum Order of Business, Page XIII.

## THE CONSTITUTION.

|  | Page |
|---|---|
| PREAMBLE | 3 |
| ARTICLE I.—The legislative power | 4 |
| II.—The executive power | 50 |
| III.—The judicial power | 58 |
| IV.—Obligations, duties, etc., of the States | 63 |
| V.—Amendments to | 68 |
| VI.—Law of the land, etc. | 70 |
| VII.—Ratification of | 74 |
| Amendments ratified | 75–102 |

## JEFFERSON'S MANUAL.

| SECTION I.—Importance of adhering to rules | 105 |
|---|---|
| III.—Privilege | 108 |
| VI.—Quorum | 124 |
| VII.—Call of the House | 125 |
| IX.—Speaker | 125 |
| X.—Address | 128 |
| XI.—Committees | 128 |
| XII.—Committee of the Whole | 132 |
| XIII.—Examination of witnesses | 139 |
| XIV.—Arrangement of business | 144 |
| XV.—Order | 145 |
| XVI.—Order respecting papers | 145 |
| XVII.—Order in debate | 147 |
| XVIII.—Orders of the House | 151 |
| XIX.—Petition | 164 |
| XX.—Motions | 165 |
| XXIII.—Bills, leave to bring in | 165 |
| XXIV.—Bills, first reading | 169 |
| XXV.—Bills, second reading | 169 |
| XXVI.—Bills, commitment | 170 |

[xx]

## CONTENTS

| | Page |
|---|---|
| Section XXVII.—Report of committee | 179 |
| XXVIII.—Bill, recommitment | 180 |
| XXIX.—Bill, reports taken up | 181 |
| XXX.—Quasi committee | 182 |
| XXXI.—Bill, second reading in the House | 188 |
| XXXII.—Reading papers | 188 |
| XXXIII.—Privileged questions | 190 |
| XXXIV.—The previous question | 205 |
| XXXV.—Amendments | 207 |
| XXXVI.—Division of the question | 215 |
| XXXVII.—Coexisting questions | 218 |
| XXXVIII.—Equivalent questions | 219 |
| XXXIX.—The question | 221 |
| XL.—Bills, third reading | 222 |
| XLI.—Division of the House | 222 |
| XLII.—Titles | 222 |
| XLIII.—Reconsideration | 222 |
| XLIV.—Bills sent to the other House | 226 |
| XLV.—Amendments between the Houses | 227 |
| XLVI.—Conferences | 242 |
| XLVII.—Messages | 254 |
| XLVIII.—Assent | 258 |
| XLIX.—Journals | 260 |
| L.—Adjournment | 262 |
| LI.—A session | 264 |
| LII.—Treaties | 267 |
| LIII.—Impeachment | 271 |

### THE RULES.

| | |
|---|---|
| Rule I.—Duties of the Speaker | 285 |
| II.—Election of officers | 291 |
| III.—Duties of the Clerk | 292 |
| IV.—Duties of the Sergeant at Arms | 295 |
| V.—Duties of the Doorkeeper | 296 |
| VI.—Duties of the Postmaster | 297 |
| VII.—Duties of the Chaplain | 298 |
| VIII.—Of the Members | 298 |
| IX.—Questions of privilege | 300 |
| X.—Standing committees | 302 |
| XI.—Powers and duties of committees | 307 |
| XII.—Delegates | 330 |

[x]

## CONTENTS

| | Page |
|---|---|
| Rule XIII.—Calendars and reports of committees | 340 |
| XIV.—Of decorum and debate | 344 |
| XV.—On calls of the roll and House | 352 |
| XVI.—On motions, their precedence, etc. | 356 |
| XVII.—Previous question | 374 |
| XVIII.—Reconsideration | 378 |
| XIX.—Of amendments | 383 |
| XX.—Of amendments of the Senate | 385 |
| XXI.—On bills | 387 |
| XXII.—On petitions, memorials, bills, and resolutions | 402 |
| XXIII.—Of Committees of the Whole House | 407 |
| XXIV.—Order of business | 417 |
| XXV.—Priority of business | 433 |
| XXVI.—Unfinished business of the session | 433 |
| XXVII.—Change or suspension of the rules | 434 |
| XXVIII.—Conference reports | 442 |
| XXIX.—Secret sessions | 444 |
| XXX.—Reading of papers | 445 |
| XXXI.—Drawing of seats | 446 |
| XXXII.—Hall of the House | 447 |
| XXXIII.—Of admission to the floor | 448 |
| XXXIV.—Of admission to the galleries | 449 |
| XXXV.—Official and other reporters | 450 |
| XXXVI.—Pay of witnesses | 455 |
| XXXVII.—Papers | 455 |
| XXXVIII.—Withdrawal of papers | 456 |
| XXXIX.—Ballot | 457 |
| XL.—Messages | 457 |
| XLI.—Executive communications | 457 |
| XLII.—Qualifications of officers and employees | 458 |
| XLIII.—Jefferson's Manual | 458 |

### PROVISIONS OF LEGISLATIVE REORGANIZATION ACT OF 1946 APPLICABLE TO BOTH HOUSES.

| | |
|---|---|
| Committee powers | 461 |
| Committee procedure | 460 |
| Conference rules on amendments in nature of substitute | 462 |
| Congressional adjournment | 450 |
| Hearings and reports by Appropriations Committees | 464 |

[xi]

## CONTENTS

Legislative budget................................. 463
Legislative oversight by standing committees... ......... 462
Preservation of committee hearings................... 465
Private bills banned............................. 469
Records of Congress............................. 465

### MISCELLANEOUS PROVISIONS OF LEGISLATIVE RE-ORGANIZATION ACT OF 1946.

Assignment of Capitol space...................... 512
Authorizations of appropriations and personnel.......... 513
Compensation and retirement pay of Members........... 534
Committee staffs............................... 503
Correction of military and naval records............. 509
Economic Report of the President................... 512
Expenditure analysis by Comptroller General........... 509
Federal Tort Claims Act......................... 530
General Bridge Act............................. 533
Improvement of Congressional Record................ 540
Increase in compensation for certain congressional officers...... 505
Joint Committee on Printing....................... 540
Joint Committee on the Economic Report.............. 511
Joint Committee on the Library..................... 511
Legislative Reference Service...................... 507
Office of the Legislative Counsel................... 508
Regulation of Lobbying Act....................... 514
Senate and House pages' education.................. 513
Studies by Comptroller General.................... 509
Transfer of functions........................... 511

### FORMS.

Of putting questions............................ 469
Of petitions.................................. 471
Of orders, resolutions, and bills................... 471
Of reports from committees....................... 472
Of resolution providing for an investigation........... 475
Of special order for consideration of a bill.......... 475
Of letters of resignation......................... 476
Of ceremonies for deceased Members................ 477
Stages of a bill of the House..................... 481

[XXII]

## CONTENTS

### MISCELLANEOUS

Franking privilege............................. 487
Rooms in the Office Building..................... 487
Distribution of documents........................ 490
Corrupt practices act........................... 491
Printing..................................... 497
Index...................................... 586

[XXII]

§ 1, 2.

## CONSTITUTION OF THE UNITED STATES: 1787.

WE THE PEOPLE of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this CONSTITUTION for the United States of America.

§ 1. The preamble.

Decisions of the Supreme Court of the United States relating to the preamble are:

§ 2. Decisions of the court. Chisholm v. Georgia, 2 Dall., 419; McCulloch v. State of Maryland et al., 4 Wh., 316; Brown et al. v. Maryland, 12 Wh., 419; Barron v. The Mayor and City Council of Baltimore, 7 Pet., 243; Dred Scott v. Sanford, 19 Howard, 393; Lane County v. Oregon, 7 Wall., 71; Texas v. White et al., 7 Wall., 700; Chaffin v. Houseman, assignee, 92 U. S., 130; Williams v. Bruffy, 96 U. S., 176; Tennessee v. Davis, 100 U. S., 257; Langford v. United States, 101 U. S., 341; United States v. Jones, 109 U. S., 513; Fort Leavenworth Railroad Co. v. Lowe, 114 U. S., 525; The Chinese Exclusion Case, 130 U. S., 582; Geofroy v. Riggs, 133 U. S., 258; In re Neagle, 135 U. S., 1; In re Ross, 140 U. S., 453; Logan v. United States, 144 U. S., 263; Lascelles v. Georgia, 148 U. S., 537; Fong Yue Ting v. United States 149 U. S. 698; In re Tyler, 149 U. S., 164; United States v. E. C. Knight Co., 156 U. S., 1; Mattox v. United States, 156 U. S., 237; In re Quarles and Butler, 158 U. S., 532; In re Debs, Petitioner, 158 U. S., 564; Ward v. Race Horse, 163 U. S., 504; De Lima v. Bidwell, 182 U. S., 1; Prout v. Starr, 188 U. S., 537; Jacobson v. Massachusetts, 197 U. S., 11; South Carolina v. United States, 199 U. S., 437; Ellis v. U. S., 206 U. S., 246; Dick v. U. S., 208 U. S., 340; Muller v. Oregon, 208 U. S., 412.

# ARTICLE I.

**SECTION. 1.** All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

Decisions of the Supreme Court of the United States:
Hayburn's case (notes), 2 Dall., 409; Field v. Clark, 143 U. S., 649; Union Bridge Co. v. United States, 204 U. S., 364; United States v. Heinszen, 206 U. S., 370; St. Louis & Iron Mountain Railway v. Taylor, 210 U. S., 281; Monongahela Bridge Co. v. United States, 216 U. S., 177; United States v. Grimaud, 220 U. S., 614; United States v. Grimaud, 220 U. S., 506; U. S. v. Atchison, etc., R. Co., 234 U. S., 476; Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S., 194; Kansas City Southern R. Co. v. U. S., 231 U. S., 423; Bay City First Nat. Bank v. Union Trust Co., 244 U. S., 416; Hannibal Bridge Co. v. U. S., 221 U. S., 194; Light v. U. S., 220 U. S., 523; Standard Oil Co. v. U. S., 221 U. S., 1; Union Pacific R. Co. v. Snow, 231 U. S., 204; Johannessen v. U. S., 225 U. S., 227; Myers v. United States, 272 U. S., 52; McCrain v. Daugherty, 273 U. S., 135; Hampton & Co. v. United States, 276 U. S., 394; Springer v. Philippine Islands, 277 U. S., 189; Panama Refining Co. v. Ryan, 293 U. S., 388; Schechter Corp. v. U. S. (N. R. A.), 295 U. S., 495.

**SECTION. 2.** [1] The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, * * *.

This clause requires election by the people and State authority may not determine a tie by lot (I, 775).

The term of a Congress, before the ratification of the twentieth amendment to the Constitution, began on the 4th of March of the odd numbered years and extended through two years. This resulted from the action of the Continental Congress on September 13, 1788, in declaring, on authority conferred by the Federal Convention, "the first Wednesday in March next" to be "the time for commencing proceedings under the said Constitution." This date was the 4th of March, 1789. And soon after the first Congress assembled a joint committee determined that the terms of Representatives and Senators of the first class commenced on that day, and must necessarily terminate with the 3d of March, 1791 (I, 3). Under the twentieth amendment

[4]

to the Constitution the terms of Representatives and Senators begin on the 3d of January of the odd-numbered years. (See sec. 279.) By a practice having the force of common law, the House meets at 12 m. when no other hour is fixed (I, 4, 250), and as legislative rather than calendar days are observed by the Houses of Congress, it has followed that the 3d of March must extend to the hour of 12 m. on March 4, and this hour has been fixed as that on which a Congress expires (V, 6694–6697). Although the last session may be adjourned before that hour (V, 6724, footnote), in practice this does not happen; and the Speaker at the hour of 12 m., March 4, usually declares the House adjourned sine die, without motion or vote, even interrupting a pending roll call (V, 6715–6718). But a motion to adjourn may be put and carried (V, 6711–6712). The Legislative Reorganization Act, 79th Congress, (See Sec. 941) provides for sine die adjournment not later than the last day of July each year unless otherwise provided by the Congress.

**SECTION 2.** * * * and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

The House, in the decision of an election case, has rejected votes cast by persons not naturalized citizens of the United States, although they were entitled to vote under the statutes of a State (I, 811); but where an act of Congress had provided that a certain class of persons should be deprived of citizenship, a question arose over the proposed rejection of their votes in a State wherein citizenship in the United States was not a qualification of the elector (I 451). In an exceptional case the House rejected votes cast by persons lately in armed resistance to the Government, although by the law of the State they were qualified voters (I, 449); but later, the House declined to find persons disqualified as voters because they had formerly borne arms against the Government (II, 879).

Decisions of the Supreme Court of the United States.
Ex parte Yarbrough, 110 U. S., 651; Wiley v. Sinkler, 179 U. S., 58; U. S. v. Mosley, 238 U. S., 383.

[2] No person shall be a Representative who shall not have attained to the Age of twenty-five Years, * * *.

A Member-elect not being of the required age, he was not enrolled by the Clerk and he did not take the oath until he had reached the required age (I, 418).

* * * and been seven Years a Citizen of the United States, * * *.

[5]

(I, 363, 367).  It has been argued generally that the legislature derives the power herein discussed from the Federal and not the State Constitution (II, 856, 957), and therefore that the state constitution might not in this respect control the state legislature (II, 1133).  The House has sustained this view by its action (I, 536).  But where the state constitution fixed a date for an election and the legislature had not acted, although it had the opportunity, the House held the election valid (II, 546).

Decisions of the Supreme Court of the United States:

Ex parte Siebold, 100 U. S., 371; Ex parte Clarke, 100 U. S., 399; Ex parte Yarbrough, 110 U. S., 651; United States v. Waddell et al., 112 U. S., 76; In re Coy, 127 U. S., 731; Ohio v. Hildebrant, 241 U. S., 565; U. S. v. Mosley, 238 U. S., 383; U. S. v. Gradwell, 243 U. S., 476; Newberry v. U. S., 256 U. S., 232;  Smiley v. Holm, 285 U. S., 355.

² The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they shall by law appoint a different Day.

This provision of the Constitution has been superseded by the twentieth amendment.  (Sec. 299.)

In the later but not the earlier practice (I, 5) the fact that Congress has met once within the year does not make uncertain the constitutional mandate to meet on the first Monday of December (I, 6, 9-11).  Early Congresses, convened either by proclamation or law on a day earlier than the constitutional day, remained in continuous session to a time beyond that day (I, 6, 9-11).  But in the later view an existing session ends with the day appointed by the Constitution for the regular annual session (II, 1169).  Congress has frequently appointed by law a day for the meeting (I, 4, 5, 10-12, footnote).

SECTION 5.  ¹Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, * * *.

The House has the same authority to determine the right of a Delegate to his seat that it has in the case of a Member (I, 423).  The

[16]

House may not delegate the duty of judging its elections to another tribunal (I, 608), and the courts of a State have nothing to do with it (II, 969).  The House has once examined the relations of this power to the power to expel (I, 469).

As nearly all the laws governing the elections of Representatives in Congress are State laws, questions have often arisen as to the relation of this power of judging to those laws (I, 637).  The House decided very early that the certificate of a state executive issued in strict accordance with state law does not prevent examination of the votes by the House and a reversal of the return (I, 637).  The House has also held that it is not confined to the conclusions of returns made up in strict conformity to state law, but may examine the votes and correct the returns (I, 774); and the fact that a state law gives conveyance the right to reject votes for fraud and irregularities does not preclude the House from going behind the returns (II, 867).

When the question concerns not the acts of returning officers, but the act of the voter in giving his vote, the House has found more difficulty in determining on the proper exercise of its constitutional power.  While the House has always acted on the principle of giving expression to the intent of the voter (I, 575, 630, 641; II, 1090), yet in its later practice it has held that a mandatory state law, even though arbitrary, may cause the rejection of a ballot on which the intent of the voter is plain (II, 1006, 1056, 1077, 1078, 1081).

Where the state courts have upheld a state election law as constitutional the House does not ordinarily question the law (II, 856, 1071).  But where there has been no such decision the House, in determining its election case, passes on the validity of state laws under state constitutions (II, 1011, 1134), and has acted on the decision that they were unconstitutional (II, 1076, 1126).

The courts of a State have nothing to do directly with judging the elections, qualifications, and returns of Representatives in Congress (II, 969), but where the highest state court has interpreted the state law the House has concluded that it should generally be governed by this interpretation (II, 645, 731, 1041, 1045).  The House is not bound, however, by a decision on an analogous but not the identical question in issue (II, 969); and where the alleged fraud of election judges was in issue, the acquittal of those judges in the courts was held not to be an adjudication binding on the House (II, 1019).

[17]

§§ 80-84.

The statutes of the United States provide specific methods for institution of a contest as to the title to a seat in the House (I, 675, 697-705); but the House regards this law as not of absolute binding force, but rather a wholesome rule not to be departed from except for cause (I, 597, 719, 525, 523), and is sometimes by resolution modifies the procedure prescribed by the law.

Decisions of the Supreme Court of the United States:

Reed v. County Commissioners, 277 U. S., 376; Barry v. U. S. ex. rel. Cunningham, 279 U. S., 597.

* * * and a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorised to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

Out of conditions arising between 1861 and 1894 the rule was established that a majority of the Members chosen and living constituted the quorum required by the Constitution (IV, 2885-2893); but later examination has resulted in a decision confirming in the House of Representatives the construction established in the Senate that a quorum consists of a majority of Senators duly chosen and sworn (I, 635; IV, 2894-2904). So the decision of the House now is that after the House is once organized the quorum consists of a majority of those Members chosen, sworn, and living whose membership has not been terminated by resignation or by the action of the House (IV, 2889, 2898). (Speaker Clark, May 9, 1912, Record, p. 1457, 62d Cong., 1st sess.)

For many years the quorum was determined only by noting the number of Members voting (IV, 2896, 2897), with the result that Members by refusing to vote could often speak a quorum and obstruct the public business (II, 1034; IV, 2895, footnote; V, 5744). But in 1890 Mr. Speaker Reed directed the Clerk to enter on the Journal and as part of the record of a yea-and-nay vote names of Members present but not voting, thereby establishing a quorum of record (IV, 2895). This decision, afterwards sustained by the Supreme Court (IV, 2904),

established the principle that a quorum present made valid any action by the House, although no actual quorum might not vote (I, 216, footnote; IV, 2932). And thenceforth the point of order as to a quorum was required to be that no quorum was present and not that no quorum had voted (IV, 2917). At the time of the establishment of this principle the Speaker revived the count by the Chair as a method of determining the presence of a quorum at a time when no record vote was ordered (IV, 2900). The Speaker has permitted his count of a quorum to be verified by tellers (IV, 2888), but did not concede it as a right of the House to have tellers under the circumstances (IV, 2914), claiming that the Chair might determine the presence of a quorum in such manner as he should deem accurate and suitable (IV, 2932). The Chair counts all members in sight, whether in the cloak rooms or within the bar (IV, 2879). Later, as the complement to the new view of the quorum, the early theory that the presence of a quorum is as necessary during debate or other business as on a vote was revived (IV, 2935-2949); also, a line of rulings made under the old theory were overruled, and was established that the point of no quorum might be made after the House had declined to verify a division by tellers or the yeas and nays (IV, 2918-2926).

The absence of a quorum having been disclosed, there must be a quorum of record before the House may proceed to business (IV, 2952, 2953), and the point of no quorum may not be withdrawn after the absence of a quorum has been ascertained and announced by the Chair (IV, 2928-2931). But when an action has been completed, it is too late to make the point of order that a quorum was not present when it was done (IV, 2927). But where action requiring a quorum was taken in the ascertained absence of a quorum by ruling of a Speaker pro tempore, the Speaker on the next day ruled that the action was null and void (IV, 2964). But such absence of a quorum should appear from the Journal if a legislative act is to be vacated for such reason (IV, 2962), and where the assumption that a quorum was present when the House acted was uncontradicted by the Journal, it was held that this assumption might not be overthrown by expressions of opinion by Members individually (IV, 2961. A point of no quorum may prevent the report of the Chairman of a Committee of the Whole. (Speaker Gillett, Dec. 13, 1924, p. 634, 68th Cong., 2d sess.) If a question as to a quorum is raised before the reading of the Journal, a quorum must be ascertained before the reading may begin (IV, 2732, 2733). While messages are received in the absence of a quorum they are not read (IV, 3522; V, 6600, 6650). No motion is in order on the failure of a quorum but the motions to

adjourn and for a call of the House (IV, 2969). A call of the House is in order under the Constitution in the absence of other rule (IV, 2961). Those present on a call of the House may prescribe a fine as a condition on which an arrested Member may be discharged (IV, 3012, 3014), but this is rarely done.

§ 58. Salutations of the quorum to organization of the House. — At the time of organization the two Houses inform one another of the appearance of the quorum in each, and the two Houses jointly inform the President (I, 196–203). A message from one House that its quorum has appeared is not delivered to the other until a quorum has appeared there also (I, 126). But at the beginning of a second session of a Congress the House proceeded to business, although a quorum had not appeared in the Senate (I, 125). At the beginning of a second session of a Congress unsworn Members-elect were taken into account in ascertaining the presence of a quorum (I, 175). In both Houses the oath has been administered to Members-elect in the absence of a quorum (I, 174, 181, 182), although in one case the Speaker objected to such proceedings (II, 875).

§ 57. Decisions of the court. — Decisions of the Supreme Court of the United States: United States v. Ballin, 144 U. S., 1; In re Loney, 134 U. S., 317; Kilbourn v. Thompson, 103 U. S., 190; Burton v. U. S., 202 U. S., 344.

§ 58. The House determines its rules. — ¹ Each House may determine the Rules of its Proceedings, * * *.

§ 59. Power to make rules not impaired by acts or law. — The power of each House of Representatives to make its own rules may not be impaired or controlled by the rules of a preceding House (I, 187, 210; V, 6892, 6743–6747), or by a law passed by a prior Congress (I, 62, 245; IV, 3296, 3579; V, 6785, 6786). The ordinary rights and functions of the House under the Constitution are exercised in accordance with the rules (III, 2567), and under later decisions questions of so-called constitutional privilege should also be considered in accordance with the rules (Mar. 16, 1910, p. 3251; May 6, 1921, p. 1129; Apr. 8, 1926, p. 7147). But a law passed by an existing Congress with the concurrence of the House has been recognized by that House as of binding force in matters of procedure (V, 6767, 6768). In exercising its constitutional power to change its rules the House may confine itself within certain limitations (V, 6756); but the attempt of the House to deprive the Speaker of his vote as a Member by a rule was successfully resisted (V, 5966, 5967). While a law of 1789 requires the election of a Clerk before the House proceeds to business yet the House

[20]

has held that it may adopt rules before electing a Clerk (I, 235). It has adopted a rule before election of a Speaker (I, 94, 95); but in 1839 was deterred by the law of 1789 and the Constitution from adopting rules before the administration of the oath to Members-elect (I, 140). The earlier theory that an officer might be empowered to administer oaths by a rule of either House has been abandoned in later practice and the authority has been conferred by law (III, 1823, 1824, 2079, 2303, 2479).

§ 60. Precedents in the House before the adoption of rules. — Before the adoption of rules the House is governed by general parliamentary law, but the Speakers have been inclined to give weight to the precedents of the House in modifying the usual constructions of that law (V, 6759–6760). (Speaker Clark, Apr. 7, 1913, p. 77, 63d Cong., 1st sess.)

The general parliamentary law as understood in the House is founded on Jefferson's Manual and modified by the practice of American legislative assemblies, especially of the House of Representatives (V, 6761–6763), but the provisions of the House's accustomed rules are not necessarily followed (V, 5309, 5604).

§ 61. Joint action. — The two Houses of Congress adopted in the early years of the Government joint rules to govern their procedure in matters requiring concurrent action; but in 1876 these joint rules were abrogated (IV, 3430; V, 6782–6787). The most useful of their provisions continue to be observed in practice, however (IV, 3430; V, 6802). Decisions of the Supreme Court of the United States: U. S. v. Smith, 286 U. S., 6.

* * * [Each House may] punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

§ 62. Punishment and expulsion of Members. — The two methods of punishment are censure and expulsion. In action for censure the House has discussed as to whether or not the principles of the procedure of the courts should be followed (II, 1255). In one instance, pending consideration of a resolution to censure a Member, the Speaker informed him that he should retire (II, 1366), but this is not usual, and Members, against whom resolutions have been pending have participated in debate, either by consent (II, 1656) or without question as to censure (II, 1246, 1253). But after the House had voted censure and the Member has been brought to the bar by the Sergeant-at-Arms to be censured, it was held that he might not then be heard (II, 1259). A

[21]

resolution of censure should not apply to more than one Member (II, 1269, 1625). Censure is inflicted by the Speaker (II, 1259) and the words are entered in the Journal (II, 1251, 1656). When Members have resigned pending proceedings for censure, the House has nevertheless adopted the resolutions of censure (II, 1239, 1273, 1275, 1656). Members have been censured for personalities and other disorder in debate (II, 1254, 1253, 1254, 1259) assaults on the floor (II, 1655), for preventing a resolution alleged to be insulting to the House (II, 1246), and for corrupt acts (II, 1274, 1286). In one instance Members were censured for acts before the election of the then existing House (II, 1286).

The power of expulsion has been the subject of much discussion (I, 469, 476, 481; II, 1264, 1286). In one case a Member-elect who had not taken the oath was expelled (II, 1282), and in another case the power to do this was discussed (I, 476). In one instance the Senate assumed to annul its action of expulsion (II, 1243). The Supreme Court has decided that a judgment of conviction under a disqualifying statute does not compel the Senate to expel (II, 1262). The power of expulsion in its relation to offenses committed before the Members' election has been discussed (II, 1286), and in one case the Judiciary Committee of the House concluded that a Member might not be punished for an offense alleged to have been committed against a preceding Congress (II, 1286); but the House itself declined to express doubt as to its power to expel and proceeded to inflict censure (II, 1286). But this case is exceptional, and in general both Houses have distrusted their power to punish in such cases (II, 1264, 1264, 1265, 1286, 1286). The resignation of the accused Member has always caused a suspension of proceedings for expulsion (II, 1273, 1276, 1279).

The House, in a proceeding for expulsion, declined to give the Member a trial at the bar (II, 1275); but the Senate has permitted counsel to appear at its bar (II, 1263), although it declined to grant a request for a specific statement of charges or compulsory process for witnesses (II, 1264). Members threatened with expulsion have been heard on their own behalf by counsel (II, 1273, 1275), or as a matter of right (II, 1269, 1286). In general, there has been discussion as to whether or not the principles of the procedure of the courts should be followed (II, 1264). The Senate once expelled several Senators by a single resolution (II, 1258). Members and Senators have been expelled for treason (II, 1261), for high misdemeanor inconsistent with public duty (II, 1262), for friendship or association with enemies of the Government and absence from

[22]

their seats (II, 1259, 1270), and for bearing arms against the Government (II, 1261).

A proposition to censure or expel a Member presents a question of privilege (II, 1254, 2648–2651).

A resolution providing that the House immediately proceed to consider whether a Member should be expelled presents a question of privilege. (Speaker Clark, Dec. 9, 1913, pp. 594–596, Record, 62d Cong., 2d sess.)

Decisions of the Supreme Court of the United States:

Anderson v. Dunn, 6 Wh., 204; Kilbourn v. Thompson, 103 U. S., 168; United States v. Ballin, 144 U. S., 1; In re Chapman, 166 U. S., 661; Burton v. U. S., 202 U. S., 344.

## § 66. Each House to keep a Journal.

Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; * * *

The Journal and not the Congressional Record is the official record of the proceedings of the House (IV, 2727). Its nature and functions have been the subject of extended discussions (IV, 2730, footnote). The House has fixed its title (IV, 2728). While it ought to be a correct transcript of the proceedings of the House, the House has not insisted on a strict chronological order of entries (IV, 2512). The Journal is dated as of the legislative and not the calendar day (IV, 2746).

The Journal records proceedings but not the reasons therefor (IV, 2511) or the circumstances attending (IV, 2512), or the statements or opinions of Members (IV, 2817–2839). Exceptions to this rule are rare (IV, 2808, 2839). Protests have on rare occasions been admitted by the action of the House (2806, 2807), but the entry of a protest on the Journal may not be demanded by a Member as a matter of right (IV, 2795) and such demand does not present a question of privilege.

The House controls its Journal and may decide what are proceedings, even to the extent of omitting things actually done or recording things not done (IV, 2784); and the Speaker entertained a motion to amend it so as to cause it to state what was not the fact, leaving it for the House to decide on the propriety of the act (IV, 2785), holding that

[23]

he could not prevent a majority of the House from so amending the Journal as to undo an actual transaction (IV, 3061-3065). And only in rare instances the House has nullified proceedings by rescinding the records of them in the Journal (IV, 2787), the House and Senate usually insisting on the accuracy of its Journal (IV, 2783, 2786). In rare instances the House and Senate have rescinded or expunged entries in Journals of preceding Congresses (IV, 2739, footnote, 2790-2792).

**§ 72. Record of votes in the Journal.**
The Journal should record the result of every vote and state in general terms the subject of it (IV, 2804); but the result of a vote is recorded in figures only when the yeas and nays are taken (IV, 2827), or when a vote is taken by ballot, it having been determined in latest practice that the Journal should show not only the result but the state of the ballot or ballots (IV, 2823).

**§ 73. Approval of the Journal.**
It is the uniform practice of the House to approve its Journal for each legislative day (IV, 2731). Where Journals of more than one session remain unapproved, they are taken up for approval in chronological order (IV, 2771-2773). In ordinary practice the Journal is approved by the House without the formal putting of the motion to vote (IV, 2774).

**§ 74. Motions to amend the Journal.**
The motion to amend the Journal takes precedence of the motion to approve it (IV, 2760); but the motion to amend may not be submitted after the previous question is demanded on a motion to approve it (IV, 2776). An expression of opinion as to a decision of the Chair was held not in order as an amendment to the Journal (IV, 2848). While a proposed correction of the Journal may be recorded in the Journal, yet it is not in order to insert in full in this indirect way what has been denied insertion in the first instance (IV, 2782, 2894, 2895). The earlier practice was otherwise, however (IV, 2861-2863). The Journal of the last day of a session is not approved on the assembling of the next session, and is not ordinarily amended (IV, 2742, 2744).

* * * and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal.

**§ 75. Yeas and nays entered on the Journal.**

The yeas and nays may be ordered before the organization of the House (I, 91), but are not taken in Committee of the Whole (IV, 4722, 4723). They are not necessarily taken on the passage of a resolution proposing an amendment to the Constitution (V, 7038, 7039).

**§ 76. Conditions of ordering yeas and nays.**
In the earlier practice of the House it was held that less than a quorum might not order the yeas and nays, but for many years the decisions have been uniformly the other way (V, 6016-6028). Neither is a quorum necessary on a motion to reconsider the vote whereby the yeas and nays are ordered (V, 5693). When a quorum fails on a yea and nay vote it is the duty of the Speaker and the House to take notice of that fact (IV, 2952, 2953, 2985). In this case the order for the yeas and nays remains effective whenever the bill again comes before the House (V, 6014, 6015), and it has been held that the question of consideration might not intervene on a succeeding day before the second calling of the yeas and nays (V, 6949).

**§ 77. Demanding the yeas and nays.**
The yeas and nays may be demanded while the Speaker is announcing the result of a division (V, 6029), while a vote by tellers is being taken (V, 6083), and even after the announcement of the vote if the House has not passed to other business (V, 6040, 6041). But after the Speaker has announced the result of a division on a motion and is in the act of putting the question on another motion it is too late to demand the yeas and nays on the first motion (V, 6042). And it is not in order during the various processes of a division to repeat a demand for the yeas and nays which has once been refused by the House (V, 6029, 6030, 6031). The constitutional right of a Member to demand the yeas and nays may not be overruled as dilatory (V, 5737); but this constitutional right does not exist as to a vote to second a motion when such second is required by the rules (V, 6123-6126). The right to demand the yeas and nays is not waived by the fact that the Member demanding them has just made the point of no quorum and caused the Chair to count the House (V, 6044).

**§ 78. Yeas and nays ordered by one-fifth.**
In passing on a demand for the yeas and nays the Speaker need determine only whether one-fifth of those present sustain the demand (V, 6045). After the House, on a vote by tellers, has refused to order the yeas and nays it is too late to demand the count of the negative on an original rising vote (V, 6045).

CONSTITUTION OF THE UNITED STATES

**SECTION 7.** [1] All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

This provision has been the subject of much discussion (II, 1488, 1490). In the earlier days the practice was not always correct (II, 1486); but in later years the House has insisted on its prerogative and the Senate has often shown reluctance to infringe thereon (II, 1482, 1483, 1493). In several instances, however, the subject has been matter of contention, conference (II, 1487, 1489), and final disagreement (II, 1485, 1487, 1489). Sometimes, however, when the House has questioned an invasion of prerogative, the Senate has receded (II, 1496, 1498). The disagreements have been especially vigorous over the right of the Senate to concur with amendments (II, 1489), and while the Senate has acquiesced in the sole right of the House to originate revenue bills, it has at the same time held to a broad power of amendment (II, 1497–1499). The House has frequently challenged the Senate on this point (II, 1491, 1494, 1495) (Feb. 1, 1909, 60th Cong., 2d sess.). When the House has conceived that its prerogative has been invaded, it has ordered the bill to be returned to the Senate (II, 1498–1499) (Feb. 2, 1925, 68th Cong., 2d sess.) or declined to proceed further with it (II, 1485). In one instance a revenue question was not objected to until the stage of conference (II, 1492). On January 16, 1924, the Senate decided that a bill proposing a gasoline tax in the District of Columbia should not originate in the Senate.

Decisions of the Supreme Court of the United States:
U. S. v. Norton, 91 U. S., 569; Field v. Clark, 143 U. S., 649; Twin City Bank v. Nebeker, 167 U. S., 196; Millard v. Roberts, 202 U. S., 429; Rainey v. U. S., 232 U. S., 310; Flint v. Stone Tracy Co., 220 U. S., 107; Hubbard v. Lowe, 226 Fed., 135; U. S. v. Hill, 123 U. S., 681.

[2] Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall

[22]

return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively.  *  *  *.

The approval of a bill by the President of the United States is valid only with his signature (IV, 3496). At the close of a Congress, when the two Houses prolong their sessions into the forenoon of March 4, the approvals have been dated on the prior legislative day, as the legislative portion of March 4 belongs to the term of the new Congress. In one instance, however, bills signed on the forenoon of March 4 were dated as of that day with the hour and minute of approval given with the date (IV, 3499). The twentieth amendment to the Constitution changed the date of meeting of the Congress to January 3d (§ 261). The act of President Tyler in filing with a bill an exposition of his reasons for signing it was examined and severely criticised by a committee of the House (IV, 3492); and in 1842 a committee of the House discussed the act of President Jackson in writing above his signature of approval a memorandum of his construction of the bill (IV, 3493). But where the President has accompanied his message announcing the approval with a statement of his reasons there has been no question in the House (IV, 3491). The statutes require that bills signed by the President shall be received by the Secretary of State (IV, 3485) and deposited in his office (IV, 3429).

Notice of the signature of a bill by the President is sent by message to the House in which it originated and that House informs the other (IV, 3429). But this notice is not necessary to the validity of the act (IV, 3495). Sometimes, at the close of a Congress the President informs the House of such bills as he has approved and of such as be

[23]

has allowed to fail (IV, 3499–3502). In one instance he communicated his omission to sign a bill through the committee appointed to notify him that Congress was about to adjourn (IV, 3504). A bill that had not actually passed having been signed by the President, he disregarded it and a new bill was passed (IV, 3496). Messages of the President giving notice of bills approved are entered in the Journal and published in the Congressional Record (V, 6593).

A message withholding approval of a bill, called a veto message, is sent to the House in which the bill originated; but it has been held that such a message may not be returned to the President on his request (IV, 3521). A vetoed bill received in the House by way of the Senate is considered as if received directly from the President and supersedes the regular order of business (IV, 3537). A veto message may not be read in the absence of a quorum, even though the House be about to adjourn sine die (IV, 3522); but the message may be read and acted on at the next session of the same Congress (IV, 3521). When the President has been prevented by adjournment from returning a bill with his objections he has sometimes at the next session communicated his reasons for not approving (IV, 6615–6620).

It is the usual but not invariable rule that a bill returned with the objections of the President shall be voted on at once (IV, 3534–3536), but it has been held that the constitutional mandate that "the House shall proceed to consider" means that the House shall immediately proceed to consider it under the rules of the House, and that the ordinary motions under the rules of the House—to refer, to commit, or to postpone to a day certain—are in order. (Speaker Gillett, May 15, 1924, 68th Cong. 1st sess., p. 8663; IV, 3542–3566.) A motion to refer a vetoed bill, either with or without the message, has been held allowable within the constitutional mandate that the House "shall proceed to reconsider" (IV, 3539). But while the ordinary motion to refer may be applied to a vetoed bill, it is not in order to move to recommit it pending the demand for the previous question or after it is ordered (IV, 3551). (Speaker Gillett, Aug. 19, 1919, p. 3893.) A vetoed bill having been rejected by the House, the message was referred (IV, 3552). Committees to which vetoed bills have been referred have sometimes neglected to report (IV, 3522, 3559, footnotes). A vetoed bill may be laid on the table (IV, 3549), but it is still highly privileged and a motion to take it from the table is in order at any time (IV, 3549). Also a motion to discharge a committee from the consideration of such a bill is privileged (IV, 3532). While

[34]

a vetoed bill is always privileged, the same is not true of a bill reported in lieu of it (IV, 3521).

If two-thirds of the House to which a bill is returned with the President's objections agree to pass it, and then two-thirds of the other House also agree, it becomes a law (IV, 3529). The two-thirds vote required to pass the bill is two-thirds of the Members present and not two-thirds of the total membership of the House (IV, 2537, 2538, Missouri Pac. Ry. Co. v. Kansas, 248 U. S., 276). Only Members voting should be considered in determining whether two-thirds voted in the affirmative. (Speaker Clark, Aug. 12, 1912, 62d Cong. 2d sess., p. 10847.) Motion to reconsider may not be applied to the vote on reconsideration of a bill returned with the objections of the President (V, 5644). (Speaker Clark, Feb. 19, 1913, 62d Cong. 3d sess., p. 3480.)

It is the practice for one House to inform the other by message of its decision that a bill returned with the objections of the President shall not pass (IV, 3539–3541). A bill passed notwithstanding the objections of the President is sent by the presiding officer of the House which last acts on it to the Secretary of State for preservation (IV, 3534), and the Secretary of State receives it and deposits it in his office (IV, 3485).

A bill incorrectly enrolled has been recalled from the President, who erased his signature (IV, 3506). Bills sent to the President but not yet signed by him are sometimes recalled by concurrent resolution of the two Houses (IV, 3507–3509), and amended; but this proceeding is regarded as irregular (IV, 3510–3516). An error in an enrolled bill that has gone to the President may also be corrected by a supplementary joint resolution (IV, 3519).

Decision of the Supreme Court of the United States:

Missouri Pac. Ry. Co. v. Kansas, 248 U. S., 276; U. S. v. Smith, 286 U. S., 6; Edwards v. U. S., 286 U. S., 482; Wright v. United States, 302 U. S., 583.

* * * If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

The ayes and nays are required to pass a bill over the President's veto (IV, 2726, 2826).

The President may sign a bill within ten days, even though the House may in the meantime have adjourned for a recess (IV, 3482, 3494, 3496), and a bill so signed during a recess (as distinguished from sine die adjournment) has been held to be valid by the Supreme Court (IV, 3496). There is much doubt, however, as to whether a bill which remains with the President ten days without his signature, Congress having in the meanwhile adjourned for a recess, becomes a law (IV, 3496). (See also Report No. 2854, 69th Cong., 2d sess.) There is also a question as to the return of a vetoed bill, Congress being in recess beyond the limit of ten days (IV, 3496). A bill which is passed by both Houses of Congress during the first regular session of a particular Congress and presented to the President less than ten days (Sundays excepted) before the adjournment of that session, but is neither signed by the President, nor returned by him to the House in which it originated, does not become a law. ("The Pocket Veto Case," 279 U. S. 655.) In one instance the President signed a bill after a final adjournment of Congress but within ten days. This, however, gave rise to grave doubts and resulted in an adverse report by a House committee (IV, 3497). President Hoover, after the final adjournment of the Seventy-first Congress, but within ten days signed several bills (46 U. S. Stat.) and the Supreme Court in Edwards v. U.S., 286 U. S., 482, upheld his right so to do. The second session of the Sixty-sixth Congress adjourned sine die on June 5, 1920. President Wilson signed several bills subsequent to this adjournment, on June 16, and June 14, 1920 (41 U. S. Stat., p. 1077). Presidents currently sign bills after sine die adjournment but within ten days after their receipt.

Decisions of the Supreme Court of the United States:

§ 108. Decisions of the court. — Field v. Clark, 143 U. S., 649; United States v. Ballin, 144 U. S., 1; Twin City Bank v. Nebeker, 167 U. S., 196; La Abra Silver Mining Co. v. United States, 175 U. S., 423; Wilkes County v. Coler, 180 U. S., 506; The Pocket Veto Case, 279 U. S., 655; Edwards v. U. S., 286 U. S., 482; Wright v. U. S., 302 U. S., 583.

[superscript 3] Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of

[38]

---

the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

It has been settled conclusively that a joint resolution proposing an amendment to the Constitution should not be presented to the President for his approval (V, 7040). Although the requirement of the Constitution seems specific, the practice of Congress has been to present to the President for approval only such concurrent resolutions as are legislative in effect (IV, 3483, 3484).

Decisions of the Supreme Court of the United States:

§ 111. Decisions of the court. — Field v. Clark, 143 U. S., 649; United States v. Ballin, 144 U. S., 1; Fourteen Diamond Rings v. United States, 183 U. S., 176.

SECTION 8. The Congress shall have Power [superscript 1] To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts, and Excises shall be uniform throughout the United States;

Decisions of the Supreme Court of the United States:

§ 112. Decisions of the court. — Hylton v. United States, 3 Dall., 171; McCulloch v. State of Maryland, 4 Wh., 316; Loughborough v. Blake, 5 Wh., 317; Osborn v. Bank of the United States, 9 Wh., 738; Weston et al. v. City Council of Charleston, 2 Pet., 449; Dobbins v. The Commissioners of Erie County, 16 Pet., 435; License Cases, 5 How., 504; Cooley v. Board of Wardens of Port of Philadelphia et al., 12 How., 299; McGuire v. The Commonwealth, 3 Wall., 387; Van Allen v. The Assessors, 3 Wall., 573; Bradley v. The People, 4 Wall., 459; License Tax Cases, 5 Wall., 462; Perveer v. The Commonwealth, 5 Wall., 475; Woodruff v. Parham, 8 Wall., 123; Hinson v. Lott, 8 Wall., 148; Veazie Bank v. Fenno, 8 Wall., 533; The Collector v. Day, 11 Wall., 113; United States v. Singer, 15 Wall., 111; State tax on foreign-held bonds, 15 Wall., 300; United States v. Railroad Company, 17 Wall., 322; Railroad Company v. Peniston, 18 Wall., 5; Scholey v. Rew, 23 Wall., 331; National Bank v. United States, 101 U. S., 1; Springer v. United States, 102 U. S., 586; Legal Tender Case, 110 U. S., 421; Head

[37]

CONSTITUTION OF THE UNITED STATES

misbehavior that shows disqualification to hold and exercise the office, whether moral, intellectual, or physical (III, 2015), yet the House has impeached judges for improper personal habits (III, 2328, 2503), and in the impeachment of the President one of the articles charged him with "intemperate, inflammatory, and scandalous harangues" in public addresses, tending to the harm of the Government (III, 2429). There was no conviction under these charges except in the single case of Judge Pickering, who was charged with intoxication on the bench (III, 2326, 2341). As to the impeachment of judges for other delinquencies, there has been much contention as to whether they may be impeached for any breach of good behavior (III, 2014, 2016, 2497), or only for judicial misconduct occurring in the actual administration of justice in connection with the court (III, 2040, 2013, 2047). The intent of the judge (III, 2014, 2382) as related to mistakes of the law, and the relations of intent to conviction have been discussed at length (III, 2014, 2361, 2382, 2516, 2549). The statutes make nonresidence of a judge an impeachable offense, and the House has taken steps to impeach for this cause (III, 2476, 2547). There has, however, been some question as to the power of Congress to make an impeachable offense (III, 2014, 2045, 2521, 2547). Usurpation of power has been examined several times in its relations as a cause for impeachment (III, 2404, 2508, 2309, 2516, 2517). There has also been discussion as to whether or not there is distinction between a misdemeanor and a high misdemeanor (III, 2278, 2267, 2402).

§ 185. Decisions of the supreme court. Decisions of the Supreme Court of the United States:

Langford v. United States, 101 U. S., 341; Shortleff v. U. S., 189 U. S., 311.

## ARTICLE III.

SECTION 1. The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation,

§ 186. The judges shall remain, and compensation.

[58]

---

which shall not be diminished during their Continuance in Office.

Decisions of the Supreme Court of the United States:

§ 187. Decisions of the court.
Chisholm, ex., v. Georgia, 2 Dall., 419; Stuart v. Laird, 1 Cr., 299; United States v. Peters, 5 Cr., 115; Cohens v. Virginia, 6 Cr., 264; Martin v. Hunter's Lessee, 1 Wh., 304; Osborn v. United States Bank, 9 Wh., 738; Bonner et al. v. Porter, 9 How., 235; The United States v. Ritchie, 17 How., 525; Murray's Lessee et al. v. Hoboken Land and Improvement Company, 18 How., 272; Ex parte Vallandigham, 1 Wall., 243; Pennoyer v. Neff, 95 U. S., 714; United States v. Union Pacific Railroad Co., 98 U. S., 569; Mitchell v. Clark, 110 U. S., 633; Ames v. Kansas, 111 U. S. 449; In re Loney, 134 U. S., 372; In re Green, 134 U. S., 377; McAllister v. United States, 141 U. S., 174; Robertson v. Baldwin, 165 U. S., 275; Hanover National Bank v. Moyses, 186 U. S., 181; Turner v. Williams, 194 U. S., 279; Ex parte Wisner, 203 U. S., 449; Interstate Commerce Commission v. Illinois Cent. R. Co., 215 U. S., 452; Muskrat v. U. S., 219 U. S., 346; U. S. v. Evans, 213 U. S., 297; Johannessen v. U. S., 225 U. S., 227; Oceanic Steam Nav. Co. v. Thranahan, 214 U. S., 320; Myers v. United States, 272 U. S., 53; Springer v. Philippine Islands, 277 U. S., 189; Ex parte Bakelite Corp., 279 U. S., 438; O'Donoghue v. U. S., 289 U. S., 516; Williams v. U. S., 289 U. S., 553.

SECTION 2. [1] The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority[1];—to all cases affecting Ambassadors, other public Ministers and Consuls[2];—to all Cases of admiralty and maritime Jurisdiction[3];—to Controversies to which the United States shall be a Party[4];—to Controversies between two or more States[5];—between a State and Citizens of another State[6];—between Citizens of different States[7]; —between Citizens of the same State claiming lands under Grants of different States[8], and between a

§ 188. Extent of the judicial power.

[59]

§ 99.
State, or the Citizens thereof, and foreign States, Citizens or Subjects².

Recent decisions of the Supreme Court of the United States:

§ 99. Decisions of the court.
¹Missouri v. Illinois, 180 U. S., 208; ¹Eastern Building Association v. Welling, 181 U. S., 47; ¹Dooley v. United States, 182 U. S., 222; Tullock v. Mulvane, 184 U. S., 497; Patton v. Brady, 184 U. S., 608; ¹Kansas v. Colorado, 185 U. S., 125; ¹Swafford v. Templeton, 185 U. S., 487; ¹Mobile Transportation Co. v. Mobile, 187 U. S., 479; ¹Andrews v. Andrews, 188 U. S., 14; ¹Hooker v. Los Angeles, 188 U. S., 314; ¹Cummings v. Chicago, 188 U. S., 410; ¹Schaefer v. Werling, 188 U. S., 516; ¹The Roanoke, 189 U. S., 185; ¹Detroit, &c., Ry. v. Osborn, 189 U. S., 383; ¹Patterson v. Bark Eudora, 190 U. S., 169; ¹Howard v. Fleming, 191 U. S., 126; ¹ ¹Arbuckle v. Blackburn, 191 U. S., 405; ¹Deposit Bank v. Frankfort, 191 U. S., 499; ¹ ¹Spencer v. Duplex Bill Co., 194 U. S., 526; ¹Wabash R. R. Co. v. Pearce, 192 U. S., 179; ¹Rogers v. Alabama, 192 U. S., 226; ¹South Dakota v. North Carolina, 192 U. S., 286; ¹Bankers' Casualty Co. v. Minn., St. P., &c., Ry., 192 U. S., 371; ¹Sprechels Sugar Refining Co. v. McClain, 192 U. S., 397; ¹Minnesota v. Northern Securities Co., 194 U. S., 63; ¹Pacific Electric Ry. Co. v. Los Angeles, 194 U. S., 132; ¹Hooker v. Burr, 194 U. S., 415; ¹Cleveland v. Cleveland City Ry. Co., 194 U. S., 517; ¹Traction Company v. Mining Co., 196 U. S., 239; ¹Dawson v. Columbia Trust Co. 197 U. S., 178; ¹Jacobson v. Massachusetts, 197 U. S., 11; ¹Leonard v. Vicksburg, &c., R. R. Co., 198 U. S., 416; ¹Farrell v. O'Brien, 199 U. S., 89; ¹South Carolina v. United States, 199 U. S., 437; ¹Carter v. Caldwell, 200 U. S., 293; ¹Security Mutual Life Ins. Co. v. Prewitt, 202 U. S., 246; ¹Kansas v. United States, 204 U. S., 331; ¹The Winnebago, 205 U. S., 354; ¹Lee v. New Jersey, 207 U. S., 67; St. Louis & Iron Mountain Railway v. Taylor, 210 U. S., 281; ¹Berea College v. Kentucky, 211 U. S., 45; ¹North American Cold Storage Co. v. Chicago, 211 U. S., 306; ¹Waters-Pierce Oil Co. v. Texas, 212 U. S., 112; Wilson v. Consolidated Gas Co., 212 U. S., 19; ¹American Express Co. v. Mullins, 212 U. S., 311; Bonner v. Gorman, 212 U. S., 86; ¹Atchison, Topeka & Santa Fe Ry. v. Sowers, 213 U. S., 55; ¹Adams Express Co. v. Kentucky, 214 U. S., 218; ¹Oceanic Steam Navigation Co. v. Stranahan, 214 U. S., 320; ¹Goodrich v. Ferris, 214 U. S., 71; ¹Smithsonian Institution v. St. John, 214 U. S., 19; ¹Western Union Telegraph Co. v. Chiles, 214 U. S., 274; ¹El Paso & Northeastern Ry. Co. v. Gutierrez, 215 U. S., 87; ¹Weems v. United States, 217 U. S., 349; Virginia v. West Virginia, 246 U. S., 565; Hamilton v. Kentucky

Distilleries Co., 251 U. S., 146; ¹Tutun v. United States, 270 U. S., 568; Postum Cereal Co. v. Calif. Fig Nut Co., 272 U. S., 693; Liberty Warehouse Co. v. Grannis, 273 U. S., 70; ¹Lemke Co. v. Industrial Com., 279 U. S., 109; Ex parte Bakelite Corp., 279 U. S., 438.

² In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

§ 28. Original and appellate jurisdiction of the Supreme Court.

Decisions of the Supreme Court of the United States:

§ 28. Decisions of the court.
Chisholm, ex., v. Georgia, 2 Dall., 419; Wiscart et al. v. Dauchy, 3 Dall., 321; Marbury v. Madison, 1 Cr., 137; Durousseau et al. v. United States, 6 Cr., 307; Martin v. Hunter's Lessee, 1 Wh., 304; Cohens v. Virginia, 6 Wh., 264; Ex parte Kearney, 7 Wh., 38; Wayman v. Southard, 10 Wh., 1; Bank of the United States v. Halstead, 10 Wh., 51; United States v. Ortega, 11 Wh., 467; The Cherokee Nation v. The State of Georgia, 5 Pet., 1; Ex parte Crane et al., 5 Pet., 189; The State of New Jersey v. The State of New York, 6 Pet., 323; Ex parte Sibbald v. United States, 12 Pet., 488; The State of Rhode Island v. The State of Massachusetts, 12 Pet., 657; State of Pennsylvania v. The Wheeling, &c., Bridge Company, 13 How., 518; In re Kaine, 14 How., 103; Ableman v. Booth and United States v. Booth, 21 How., 506; Freeborn v. Smith, 2 Wall., 160; Ex parte McCardle, 6 Wall., 318; Ex parte McCardle, 7 Wall., 506; Ex parte Yerger, 8 Wall., 85; The Lucy, 8 Wall., 307; The Justices v. Murray, 9 Wall., 274; Pennsylvania v. Quicksilver Company, 10 Wall., 553; Murdock v. City of Memphis, 20 Wall., 590; The "Francis Wright," 105 U. S., 381; Bors v. Preston, 111 U. S., 252; Ames v. Kansas, 111 U. S., 449; Craig v. Leitensdorfer, 127 U. S., 764; Wisconsin v. Pelican Ins. Co., 127 U. S., 265; United States v. Texas, 143 U. S., 621; Louisiana v. Texas, 176 U. S., 1; Wilkes County v. Coler, 180 U. S., 506; W. W. Cargill Co. v. Minnesota, 180 U. S., 452; Maltzei v. North Carolina, 181 U. S., 500; United States v. Bitty, 208 U. S., 393; Oklahoma v. Gulf, etc.,

CONSTITUTION OF THE UNITED STATES

§230-235.
R. Co., 230 U. S., 380; Virginia v. West Virginia, 220 U. S., 1; Duhne v. New Jersey, 251 U. S., 311; Popovici v. Agler, 280 U. S., 379.

§ 232. Venue of trial of crimes by jury.
[1] The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

Decisions of the Supreme Court of the United States:

§ 232. Decisions of the court.
Ex parte Milligan, 4 Wall., 2; Barton v. Barbour, 104 U. S., 126; Ex parte Lange, 197 U. S., 265; Callan v. Wilson, 127 U. S., 540; Nashville, Chattanooga, etc., Railway v. Alabama, 128 U. S., 96; Eilenbecker v. Plymouth County, 134 U. S., 31; Jones v. United States, 137 U. S., 202; Cook v. United States, 138 U. S., 157; In re Ross, 140 U. S., 453; Fong Yu Ting v. United States, 149 U. S., 698; In re Debs, petitioner, 158 U. S., 564; Thompson v. Utah, 170 U. S., 343; Schick v. United States, 195 U. S., 65; Dorr v. United States, 195 U. S., 138; Matter of Strauss, 197 U. S., 324; Marvin v. Trout, 199 U. S., 212; Martin v. Texas, 200 U. S., 316; Tinsley v. Treat, 205 U. S., 20; Armour Packing Co. v. United States, 209 U. S., 56; Haas v. Henkel, 216 U. S., 462; Patton v. United States, 281 U. S., 276.

§ 233. Treason against the United States.
SECTION. 3. [1] Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

Decisions of the Supreme Court of the United States:

§ 233. Decisions of the court.
United States v. The Insurgents, 2 Dall., 335; United States v. Mitchell, 2 Dall., 348; Ex parte Bollman and Swartwout, 4 Cr., 75; United States v. Aaron Burr, 4 Cr., 469.

[62]

CONSTITUTION OF THE UNITED STATES
§234-235.
[1] The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the person Attainted.

§ 234. Punishment for treason.

Decisions of the Supreme Court of the United States:

§ 235. Decisions of the court.
Bigelow v. Forest, 9 Wall., 339; Day v. Micou, 18 Wall., 156; Ex parte Lange, 18 Wall., 163; Wallach et al. v. Van Riswick, 92 U. S., 202.

## ARTICLE IV.

SECTION. 1. Full Faith and Credit shall be given in each State to the Public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

§ 236. Each State to give credit to acts, records, etc., of other States.

Decisions of the Supreme Court of the United States:

§ 236. Decisions of the court.
Mills v. Duryee, 7 Cr., 464; Hampton v. McConnel, 3 Wh., 234; Mayhew v. Thatcher, 6 Wh., 129; Darby's Lessee v. Mayer, 10 Wh., 465; The United States v. Amedy, 11 Wh., 392; Caldwell et al. v. Carrington's heirs, 9 Pet., 86; M'Elmoyle v. Cohen, 13 Pet., 312; The Bank of Augusta v. Earle, 13 Pet., 519; Bank of the State of Alabama v. Dalton, 9 How., 522; D'Arcy v. Ketchum, 11 How., 165; Christmas v. Russell, 5 Wall., 290; Green v. Van Buskirk, 7 Wall., 139; Paul v. Virginia, 8 Wall., 168; Board of Public Works v. Columbia College, 17 Wall., 521; Thompson v. Whitman, 18 Wall., 457; Pennoyer v. Neff, 95 U. S. 714; Bonaparte v. Tax Court, 104 U. S. 592; Robertson v. Pickrell, 109 U. S., 608; Brown et al. v. Houston, Collector, et al., 114 U. S., 622; Hanley v. Donoghue, 116 U. S., 1; Renaud v. Abbott, 116 U. S., 277; Chicago & Alton R. R. v. Wiggins Ferry Co., 119 U. S., 615; Bover v. Chapman, 119 U. S., 587; Cole v. Cunningham, 133 U. S., 107; Blount v. Walker, 134 U. S., 607; Simmons v. Saul, 138 U. S., 439; Reynolds v. Stockton,

[63]

## STAGES OF A BILL OF THE HOUSE.

§ 322.

### 1. Introduction:

§ 322. Introduction of a bill and its passage to final passage.

By a Member by laying the bill on the Clerk's table informally. A Member sometimes introduces a petition only, leaving to the committee the drawing of a bill, such a petition referred to a committee having jurisdiction of the subject giving authority to report a bill. Sometimes communications addressed to the House from the executive departments or from other sources are referred to committees by the Speaker and give authority for the committees to originate bills. Messages from the President also are referred by the Speaker or the House and give jurisdiction to the committees receiving them to originate bills.

### 2. Reference to a standing or select committee:

Public bills are referred under direction of the Speaker; private bills are indorsed with the names of the committees to which they go under the rule by the Members introducing them. Senate bills are referred under direction of the Speaker. A bill is numbered and printed when referred.

### 3. Reported from the committee:

Committees having leave to report at any time make their reports from the floor; other committees make their reports by laying them on the Clerk's table informally. The bill and the report are printed when reported.

### 4. Placed on the Calendar:

Occasionally a privileged bill is considered when reported; but usually it is placed with the unprivileged bills on the Calendar where it belongs under the rule by direction of the Speaker.

### 5. Consideration in Committee of the Whole:

Public bills which do not raise revenue or make or authorize appropriations of money or property do not go through this stage. All other bills are considered in Committee of the Whole. The stages of consideration in Committee of the Whole are: General debate; reading for amendment under the five-minute rule; order to lay aside with a favorable recommendation, or to rise and report; reporting of to the House.

[ 481 ]

BILLS

## 6. Reading a second time in the House:

Bills not requiring consideration in Committee of the Whole are read a second time in full, after which they are open to debate and amendment in any part. Bills considered in Committee of the Whole are read a second time in full in that committee and when reported out, with or without amendments, are not read in full again, but are subject to further debate or amendment in the House unless the previous question is ordered at once.

## 7. Engrossment and third reading:

The question on House bills is taken on ordering the engrossment and third reading at one vote. If decided in the affirmative, the reading a third time usually takes place at once, by title. But any Member may demand the reading in full of the engrossed copy, in which case the bill is laid aside until it can be engrossed. Senate bills come to the House in engrossed form, and the question is put on third reading alone. When the question on engrossment and third reading of a House bill or third reading of a Senate bill is decided in the negative the bill is lost as much as if defeated on the final passage. The question on engrossment and third reading is not made from the floor, but is put by the Speaker as a matter of course.

## 8. Passage:

The question on the passage of a bill is put by the Speaker as a matter of course, without awaiting a motion from the floor.

## 9. Transmission to the Senate by message.

## 10. Consideration by the Senate:

In the Senate House bills are usually referred to committees for consideration and report, after which they have their several readings, with opportunities for debate and amendment. The same procedure takes place in the House as to bills sent from the Senate.

## 11. Return of, from the Senate without amendments:

If the Senate passes a House bill without amendment it returns it to the House, where it is at once enrolled on parchment for signature. A bill thus passed without amendment goes into

[482]

BILLS

possession of the clerk, and is not laid before the House prior to enrollment. If the Senate rejects a House bill the House is informed. Similar procedure occurs when the House passes a Senate bill without amendment.

## 12. Return of, from the Senate with amendments:

House bills returned with Senate amendments go to the Speaker's table. If any Senate amendment requires consideration in Committee of the Whole the bill is referred by the Speaker informally to the standing committee having jurisdiction, and when that committee reports the bill with recommendations it is referred to Committee of the Whole House on the state of the Union, to be there considered and reported to the House itself. When no Senate amendment requires consideration in Committee of the Whole the bills come before the House directly from the Speaker's table.

## 13. Consideration of Senate amendments by the House:

When a bill with Senate amendments comes before the House, the House takes up each amendment by itself and may vote to agree to it, agree to it with an amendment, or disagree to it. If it disagrees it may ask a conference with the Senate or may send notice of its disagreement, leaving it to the Senate to recede or insist and ask the conference.

## 14. Settlement of differences by conference:

When disagreements are referred to conference, the managers embody their settlement in a report, which is acted on by each House as a whole. When this report is agreed to the bill is finally passed, and is at once enrolled for signature.

## 15. Enrollment on parchment:

The House in which a bill originates enrolls it.

## 16. Examination by the Committee on House Administration:

The chairmen of the Committee on House Administration or Senate Committee on Rules and Administration as the case may be affixes to the bills examined a certificate that the bill has been found truly enrolled.

94047°—S. Doc. 769, 79–2—32  [483]

RULES

**17. Signing by the Speaker and President of the Senate:**

The enrolled bill is first laid before the House of Representatives and signed by the Speaker, whether it be a House or Senate bill, after which it is transmitted to the Senate and signed by the president of that body.

**18. Transmittal to the President of the United States:**

The Chairman of the Committee on House Administration or the Chairman of the Senate Committee on Rules and Administration as the case may be carries the bills from his House to the President. In the House of Representatives a report of the bills taken to the President each day is made to the House and entered on its Journal.

**19. Approval by the President:**

If the President approves he does so with his signature.

**20. Disapproval by the President:**

When the President disapproves a bill he returns it to the House in which it originated, with a message stating that he disapproves, and giving his reasons therefor.

**21. Action on, when returned disapproved:**

The House to which a disapproved bill is returned has the message read and spread on its Journal. It may then consider at once the question of passing the bill notwithstanding the President's objections, or may postpone to a day certain, or refer to a committee for examination. The vote on passing the bill, notwithstanding the President's objections, must be carried by two-thirds. If the bill fails to pass in the House to which it is returned it remains there; but if it passes it is sent to the other House for action.

**22. Filing with the Secretary of State:**

When approved by the President a bill is deposited in the office of the Secretary of State; and when the two Houses have passed a bill, notwithstanding the President's objections, the presiding officer of the House which acts on it last transmits it to the Secretary of State.

[404]

**MISCELLANEOUS**

[405]

Serial Set
volume 1105



COPY
Reproduced at the National Archives

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and

correct copy of documents in his custody.



| SIGNATURE | | |
|---|---|---|
| NAME    Richard H. Hunt | | DATE    11/20/08 |
| TITLE    Director | | |
| Center for Legislative Archives | | |
| NAME AND ADDRESS OF DEPOSITORY | | |
| The National Archives<br>Washington, D.C. 20408 | | |

NA FORM APR 85 1407-A

UNITED STATES  OF AMERICA

# Congressional Record

### PROCEEDINGS AND DEBATES OF THE 80*th* CONGRESS
### FIRST SESSION

## VOLUME 93—PART 4

APRIL 30, 1947, TO MAY 20, 1947
(PAGES 4251 TO 5560)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1947

Case 2:10-cr-00520-JCM-RJJ  Document 40-2  Filed 07/12/12  Page 82 of 88

amount each year for the development of farm-to-market roads. The Commissioner of Public Roads, Mr. Thomas H. MacDonald, spoke in favor of the bill. General Fleming, Commissioner of Public Works, favored the bill. No one appeared in opposition to the bill. It was reported unanimously by the Public Works Committee. Three identical bills have been introduced in the other body by three different Senators. The President recommended the passage of such measure in his message to the Congress on January 3 of this year. This bill will not require a single dollar of appropriations from the Federal Treasury.

Mr. CASE of South Dakota. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. CASE of South Dakota. Does the extension apply to the farm-to-market roads as well as to the primary system?

Mr. CUNNINGHAM. It certainly does, as well as the development of the highways in the urban areas.

Mr. CASE of South Dakota. The bill is very much in order for two reasons. One is that the time when the Japanese war expired, creating the resolution which the gentleman has referred to before, came along in the fall, which gave the States a short year the first year.

Mr. CUNNINGHAM. Yes. No States started building highways prior to October of 1945. They lost 4 months to start with. Then, there was a lack of material and shortage of labor and high prices, which caused the program to be held up. The whole program will be retarded and the States will lose some of this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status

quo until the Congress took some additional action.

Mr. COLE of New York. Mr. Speaker, I withdraw my reservation of objection.

Mr. ANGELL. Mr. Speaker, reserving the right to object, as one of the members of this committee, I had an opportunity to study this bill very carefully. The people in my particular area in the Northwest are very, very much in sympathy with this bill. I think what the chairman has said and what the gentleman from Iowa [Mr. CUNNINGHAM] has said is absolutely true, that this bill is essential for our road-building program.

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

Be it enacted, etc., That paragraph (d) of section 4 of the Federal-Aid Highway Act of 1944, Public Law 521, Seventy-eighth Congress, approved December 20, 1944, is hereby amended by striking out the term "one year" where it appears in said paragraph and inserting in lieu thereof the term "two years."

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

TO CODIFY TITLE 18 OF THE UNITED STATES CODE, CRIMES AND CRIMINAL PROCEDURE

The Clerk called the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code entitled "Crimes and Criminal Procedure."

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill the second time.

Mr. WALTER. Mr. Speaker, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: On page 494, line 11, after the word "of", strike out "three" and insert "five."

Mr. WALTER. Mr. Speaker, the amendment you have just heard reported would have the effect, if adopted, of increasing the membership of the parole board from three to five.

At the last session of the Congress one of the subcommittees of the Committee on the Judiciary, in studying the legislation which we hoped might have the effect of cutting down the criminal rate in this country, found a perfectly appalling situation in the parole board. That board of three members actually interviews upward of 10,800 prisoners each year. That is, personal interviews. In addition to that, they have to review the cases acted on after personal interviews.

There are 21 criminal institutions in the United States that must be visited by this Board at regular intervals. So they have a perfectly impossible job with the result that men are paroled according to formula who should be compelled to serve their full sentence. I am not thinking about those men who are eligible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases;

that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 18.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

Case 2:10-cr-00520-JCM-RJJ   Document 48-2   Filed 07/12/12   Page 83 of 88

relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-sixth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that have assisted in the preparation of the original United States Code and every supplement and any edition of that code. These companies have worked very closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committee. In turn, the companies supplemented their regular editorial staffs by engaging the services of a revisor who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and certified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by these various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through the Chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in existing law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously reported the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of candid and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.

This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to these numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-sixth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of germane or objection to it, but I does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that they were purely a codification. But there are some changes in this bill (H. R. 3190), I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. These laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of these the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. In the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 20, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part

Case 2:10-cr-00520- CONGRESSIONAL RECORD SENATE Filed 07/18/12 Page 84 of 88

LABOR LEGISLATION—ADDRESS BY SENATOR BALL

THE PLACE OF THE UNITED STATES IN INTERNATIONAL AFFAIRS—ADDRESS BY SENATOR HATCH

PROHIBITION OF ALCOHOLIC-BEVERAGE ADVERTISEMENTS—STATEMENT OF DR. CLINTON N. HOWARD

UNIVERSAL MILITARY TRAINING—EDITORIAL FROM THE CHICAGO HERALD-AMERICAN

IS CONGRESS ANTILABOR?—EDITORIAL FROM MAGAZINE AMERICA

THE STATE DEPARTMENT'S BROADCAST TO RUSSIA—ARTICLE FROM THE NEW YORK HERALD TRIBUNE

HOUSE BILLS REFERRED

UNITED STATES  OF AMERICA

# Congressional Record

### PROCEEDINGS AND DEBATES OF THE 80*th* CONGRESS
### FIRST SESSION

## VOLUME 93—PART 8

#### JULY 21, 1947, TO NOVEMBER 17, 1947
#### (PAGES 9463 TO 10644)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1947

BUREAU OF MINES

The legislative clerk read the nomination of James Boyd, of Colorado, to be Director of the Bureau of Mines.

Mr. TAFT. Mr. President, I ask that the nomination be passed over.

The PRESIDING OFFICER. Without objection, the nomination will be passed over.

Mr. HICKENLOOPER. Mr. President, I join in the request that the nomination of James Boyd to be Director of the Bureau of Mines be passed over. I do that not for any personal reason whatsoever, but solely on the ground of doubt as to whether this nominee is fitted for the position and whether he has had the training and experience to fill the position.

The position of Director of Mines is becoming an increasingly important one. More and more he is a director of safety in the mines of this country.

At this session we passed a law with respect to continuing mine inspection in the Bureau of Mines. That law did not contain all that I wanted it to contain, but it indicates that there is a continued interest by the Federal Bureau of Mines in mine inspection. There are approximately [illegible] miners in the Nation, and of that number approximately [illegible] are engaged in coal mining. The preservation of safety has become one of the foremost duties of the Bureau of Mines. I find that Mr. Boyd is absolutely devoid of any experience in the coal-mining industry.

I want to read two questions which he very frankly and fairly answered when he was before the committee. This question was asked by the Senator from Montana [Mr. MURRAY]:

*Senator MURRAY. Mr. Boyd, what study have you given to the coal-mining industry?*

*Mr. BOYD. Senator, I have never worked in the coal-mining industry directly. I have, as a member of the faculty of the Colorado School of Mines, been instrumental in training men who have gone into the coal-mining industry. I have been on inspection trips myself to various coal mines in the West. As I have said, we had direction of coal operations in Europe, and I know something of the operations there. I have never myself been engaged in the coal-mining industry.*

And then this question was asked by the Senator from Montana:

*Senator MURRAY. You admit that you are not familiar with the conditions in the coal mines in the country, especially here in the eastern section of the country.*

*Mr. BOYD. Senator, I admit that I have never been employed in coal mines. I have studied the situation for many years, and I know the basic problems in the coal-mining industry.*

Mr. President, in view of the fact that more than half of the miners in this country are engaged in the mining of coal, and in view of the fact that the safety of those miners has become the primary duty and interest of the Federal Bureau of Mines, I feel that it is entirely fair to raise the question of the training and competency of Mr. Boyd to fill this position; and I join in the request that the nomination go over.

The PRESIDING OFFICER. The nomination will be passed over.

The clerk will state the next nomination on the calendar.

NATIONAL LABOR RELATIONS BOARD

The legislative clerk proceeded to read the nominations of two members and the general counsel of the National Labor Relations Board.

Mr. TAFT. Mr. President, I ask that the Labor Relations Board nominations go over.

The PRESIDING OFFICER. Without objection, it is so ordered.

UNITED STATES PUBLIC HEALTH SERVICE

The legislative clerk proceeded to read sundry nominations in the United States Public Health Service.

Mr. TAFT. Mr. President, I ask that the nominations in the Public Health Service be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

THE ARMY

The legislative clerk proceeded to read sundry nominations in the Army.

Mr. TAFT. Mr. President, I ask that the nominations in the Army be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

Mr. TAFT. The Senator from South Dakota [Mr. GURNEY] has additional nominations.

Mr. GURNEY. Mr. President, I submit the nominations of 179 captains, 387 first lieutenants, 123 lieutenant colonels, and also certain nominations in the Navy, and ask that they be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

POSTMASTERS

The legislative clerk proceeded to read sundry nominations of postmasters.

Mr. TAFT. Mr. President, I ask that the postmaster nominations be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the postmaster nominations are confirmed en bloc.

Mr. TAFT. I ask that the President be notified of the confirmations in all of these instances.

The PRESIDING OFFICER. Without objection, the President will be notified forthwith.

CONDITIONAL ADJOURNMENT TO JANUARY 2, 1948

Mr. TAFT. Mr. President, in accordance with the terms of Senate Concurrent Resolution 33, adopted earlier today, I move that the Senate do now adjourn.

The motion was agreed to; and (at 3 o'clock and 50 minutes a. m., Sunday, July 27, 1947) the Senate adjourned, the adjournment being, under the provision of Senate Concurrent Resolution 33, to January 2, 1948, at 12 o'clock meridian.

NOMINATIONS

Executive nominations received by the Senate July 26 (legislative day of July 16), 1947:

SECRETARY OF DEFENSE

James V. Forrestal, of New York, to be Secretary of Defense.

COLLECTOR OF INTERNAL REVENUE

John T. Jarecki, of Chicago, Ill., to be collector of internal revenue for the first district of Illinois, in place of Nigel D. Campbell, resigned.

CONFIRMATIONS

Executive nominations confirmed by the Senate July 26 (legislative day of July 16), 1947:

SECRETARY OF DEFENSE

James V. Forrestal, to be Secretary of Defense.

DEPARTMENT OF JUSTICE

Philip B. Perlman, to be Solicitor General of the United States.

DIPLOMATIC AND FOREIGN SERVICE

TO BE ENVOY EXTRAORDINARY AND MINISTER PLENIPOTENTIARY OF THE UNITED STATES OF AMERICA TO HUNGARY

Rudolf E. Schoenfeld

TO BE FOREIGN SERVICE OFFICERS OF CLASS 6, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

John A. Bovey, Jr.
Ernest E. Ramsaur, Jr.
Miss Louise Schaffner
Richard W. Stalling
James R. Bucht
Ralph A. Scot
Robert M. Winfree
Robert W. Zimmermann

TO BE FOREIGN SERVICE OFFICERS OF CLASS 2, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Charles F. Baldwin
John Lessesny Stewart
Ben H. Thibodeaux

TO BE FOREIGN SERVICE OFFICERS OF CLASS 3, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Ralph H. Curren
Jerome T. Gaspard
Oscar E. Heskin
Philip W. Ireland

TO BE FOREIGN SERVICE OFFICERS OF CLASS 4, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Turner C. Cameron, Jr.
Henry Conover
Robert C. Creel
Ridgway B. Knight
Eric Kocher
William Henry Lawrence
Frank G. Siscoe

TO BE A FOREIGN SERVICE OFFICER OF CLASS 5, A VICE CONSUL OF CAREER, AND SECRETARY IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

James R. Gustin.

TO BE FOREIGN SERVICE OFFICERS OF CLASS 6, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Robert A. Aylward
Howard L. Boorman
William D. Brewer
Edward West Burgess
Stephen A. Comiskey
William B. Dunn
Seymour M. Finger
Walter P. Hook
Vernon V. Hulse
Joseph E. Jacques
Robert L. Jones
Edward J. Kreisler, Jr.
Edward T. Long
Francis H. Meglioni
Parke D. Massey, Jr.
Everett K. Melby
Alfred E. Moon
Curtis W. Prendergast
Herbert F. Propps
Lowell G. Richardson
Jordan T. Rogers
Howard Rand Stephenson
Kenneth P. T. Sullivan
Edward J. Trost
Wayland B. Waters

Case 2:10-cr-00520-JCM-RJJ Document 40-2 Filed 07/12/12 Page 87 of 88

## ADJOURNMENT

Mr. HALLECK. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 12 o'clock and 22 minutes a. m.), pursuant to Senate Concurrent Resolution 33, the House adjourned until Friday, January 2, 1948, at 12 o'clock noon.

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:



COPY

Reproduced at the National Archives